CASE 73.—ACTION TO RECOVER LAND.—FEB. 5.

# Floyd and Wife v. Mackey.

APPEAL FROM M'LEAN CIRCUIT COURT.

JUDGMENT FOR DEFENDANT AND PLAINTIFFS APPEAL. REVERSED.

PRINCIPAL AND AGENT—DELEGATION OF AGENT'S AUTHORITY TO SELL LAND—ESTOPPEL OF MARRIED WOMAN TO DENY AGENT'S AUTHORITY—PURCHASER'S RIGHT TO COMPENSATION FOR IMPROVEMENTS.

Held: 1. An agent to sell land had no power to delegate his authority to his son, and the principal is not bound by a sale made by the son.

2. While the active participation of a married woman in the perpetration of a fraud may operate, by way of estoppel, to divest her of her interest in real estate, yet a married woman is not estopped to deny the authority of one who sold her land, where she never received any part of the purchase money, or the notes executed therefor, or in any other way ratified or approved the sale.

Floyd and Wife v. Mackey.

3. As the purchaser acted in good faith, he is entitled to compensation for his improvements, to the extent they have enhanced the vendible value of the property; and the chancellor should require him either to surrender the land upon receiving payment for improvements, or to pay the purchase money, with interest from the day of sale—the rents being equivalent to the interest.

T. R. CARTMELL AND W. S. PRYOR, FOR APPELLANTS.

HELM, BRUCE & HELM, OF COUNSEL.

This appeal brings up for review a judgment of the McLean circuit court dismissing appellant's petition in an action of ejectment, and perpetually enjoining and restraining them from asserting title to their lands now in possession of appellee. Appellee claims title to the land in controversy by reason of privity with the appellant Mrs. Lucy B. Floyd, the wife of appellant, Robert Floyd, out of which the questions of this appeal arose—otherwise appellant's title is not in dispute.

The petition of appellant's sets up title to 129½ acres of land in McLean county alleging that appellee was unlawfully in possession thereof and asked judgment for the land, for rents and damages for timber used and removed by appellee.

The action was transferred to the equity side of the docket, appellee filing answer consisting of three paragraphs—the first controverting the allegations of the petition, the second alleging that he placed lasting and valuable improvements on the land, and the third pleading an estoppel against the appellants to assert title.

As the lower court decided against appellants on the question of estoppel, none other was necessary to be there decided and none other is involved in this appeal.

Appellee alleged that prior to April 23, 1885, the appellants by written authority which they signed and delivered, appointed one L. W. Gates their agent and attorney in fact to take charge of the land in controversy, to agree with purchasers in reference to the price to be paid for same and to execute bonds for title and pursuant to this written authority, L. W. Gates sold the land to appellee and agreed with him concerning the price, to-wit, $1,175, of which sum $200 was to be paid in cash and the residue in four notes the last of which became due May 1, 1889. He then states as follows: "That while the sale of said land was made with said L. W. Gates and while the price and terms thereof were agreed upon between defendant and said L. W. Gates as attorney in fact and as agent for the plaintiffs,

said *L. W. Gates as agent and attorney in fact authorized one*
*G. W. Gates to draw up the said notes, receive the cash and to*
*execute a bond agreeing and binding . plaintiffs to convey said*
*land* upon the payment of the notes, and that said G. W. Gates
did, pursuant to said instructions make, execute and deliver
to this defendant, acting for and on behalf of the plaintiffs a
writing agreeing to convey to the defendant the land men-
tioned, all of which was reported to the agent, L. W. Gates, and
approved and ratified by him, and the facts thereof were com-
municated to the plaintiffs who received the cash received by
said Gates and the notes executed by defendant to plaintiff in
the purchase of said land, and that they approved, ratified and
agreed to everything that said L. W. Gates had done." Appellee
also alleges that the notes were delivered to appellants by L. W.
Gates and returned by them to. him for collection, he in turn
placing them in the hands of G. W. Gates, his son, for collec-
tion, and that *appellants received all the purchase money, or if*
*they did not receive it, their agent, L. W. Gates, did.* It is also
alleged that in letters written by Mrs. Floyd in 1898, she prom-
ised to make appellee a deed for the land. Appellee pleads
an estoppel as follows: "That by accepting the money and notes
and by placing the notes in the hands of L. W. Gates for col-
lection, and by agreeing and promising in writing to make said
deed, plaintiffs are estopped from asserting any claim to said
land or any part thereof." Appellants filed demurrer to the par-
agraph which was overruled. They then file reply denying in
the first paragraph knowledge or information as to what im-
provements appellee may have put on the land and in the sec-
ond paragraph denying the appointment in writing or otherwise
of L. W. Gates as agent and attorney in fact, or that he had
the authority to sell the land or agree on the purchase price or
to receive the purchase money or collect the notes, and denying
emphatically that they ever received any part of the purchase
money or notes. They deny any knowledge of the transactions
and collections by G. W. Gates, or that they knew of or ratified
any of the alleged transactions of L. W. Gates or that they
are estopped. They deny they promised to make a deed. In
the third paragraph they allege that Lucy B. Floyd was and
is the wife of Robert Floyd, that she acquired title to the
land in controversy in the year 1881, and in the year 1884 she
authorized L. W. Gates to rent this land for one year and
pursuant to this authority L. W. Gates rented and leased same
to appellee for one year at the agreed rental of $125 payable
January 1, 1885, which was not paid and is now due and that
said lease is lost. Appellee rejoins admitting he rented the

Floyd and Wife v. Mackey.

land, but alleges that it was conditioned that if he purchased in the spring of 1885 the rent bond should become null and void, and that he purchased in April, 1885, when the rent bond was delivered to him and by him destroyed. A surrejoinder makes up the issue.

Appellants claim that a married woman can not convey or dispose of her general estate and can not appoint an agent to do so. Her contracts are not only voidable, but absolutely. void, and can not be ratified, and therefore the demurrer to the answer should have been sustained.

The equity of this case is, as we contend, to render judgment for the appellant for the recovery of the land, and the reasonable rent for the time he has had possession. If the chancellor is of the opinion that he should have pay for his improvements, as the appellant has received no part of the purchase money and has brought this case into a court of equity he should be required either to surrender the land upon the condition mentioned, or pay the purchase money with interest from the date of the sale, the rents being equivalent to the interest and the appellant will be willing to make him a conveyance to the land upon the terms mentioned.

### AUTHORITIES CITED.

Kentucky Statutes, sec. 508; Johnson v. Jones, 12 B. Mon., 329; Bybee v. Smith, 88 Ky., 650; Robinson v. Robinson, etc., 11 Bush, 178; Bank of Louisville v. Gray, 84 Ky., 573; Meacham on Agency, sec. 114, 56; Am. & Eng. Ency. of Law, vol. 1, p. 110; Jennings v. Whittaker, 4 Mon., 53; Brown v. Brown, 45 Mo., 413; Jackson's Exrs. v. Halliday's Admrs., 3 Mon., 367; Dougherty v. Holloway, 5 Mon., 314; Craycroft v. Selvage, 10 Bush, 709; Am. & Eng. Ency. of Law, vol 1. p. 1005.

R. G. HIGDON & SWEENEY, ELLIS & SWEENEY, FOR APPELLEE.

Our contention in this case is:

1. Lucy B. Floyd though a married woman is estopped in this case. Stone and Wife v. Wortz, 3 Bush, 386; Story's Equity, 368; Connolly v. Brantsler, 3 Bush, 708; Heck v. Fisher, etc., 78 Ky., 643; Newman v. Moore, 94 Ky., 515; Galbraith, etc., v. Lunsford, L. R. A., vol. 1, p. 422; Cooley v. Steele, 2 Head, 606; Pelcher v. Smith, 2 Head, 208.

2. In order to create an estoppel there need be no actual fraud. Galbraith v. Lunsford, supra; Pomeroy's Equity, secs. 357, 279, Brant v. Virginia C. & L. Co., 93 U. S., 326; Con. Nat., Bank

v. Com. Nat. Bank, 50 N. Y., 575; McCollough v. Wilson, 21 Pa. St., 436; Carpenter v. Carpenter, 30 Ala., 382.

3. L. W. Gates had power to convey whether that power was written or oral. Talbot v. Rowen, 1 A. K. Mar., 325; Weest v. Yoder, 4 Bibb. 359; Casey v. Lucas, 2 Bush, 65; Smith v. White, 5 Dana, 383; Forsythe v. Bowler, 5 Bush, 549; Valentine v. Piper, 22 Pickering, 85; Barrett v. Rehm, 6 Bush; Renwick v. Bancroft, 56 Iowa, 527; Am. & Eng. Ency. of law, vol. 1, p. 369.

4. Agency to sell land is not within the Statute of Frauds and may be created by parole. Jones v. Brand, 20 R., 1997; Talbot v. Rowen, 1 A. K. Marshal, 325.

5. Appellant in any event has lien for improvements and repairs.

OPINION OF THE COURT BY JUDGE BURNAM—REVERSING.

This action was instituted by appellants against appellee to recover a tract of 129.3 acres of land situated in McLean county, and rents thereon from 1885, which they alleged that the defendant wrongfully detained from them. The defendant denied the alleged wrongful possession, and said that he had purchased the land sued for from the plaintiff, through her duly-authorized agent, L. W. Gates on the 25th day of April, 1885, for the sum of $1,200, and was put in possession by him; that, whilst the negotiations for the purchase were made with L. W. Gates as agent of plaintiff, he authorized his son G. W. Gates to conclude the transaction, and that G. W. Gates wrote the notes and executed the bond, binding plaintiff to convey the land, and that the cash was paid to G. W. Gates for his father, L. W. Gates, and that the notes were delivered to G. W. Gates, who paid the money collected by him, and delivered the notes to L. W. Gates, plaintiff's agent, who, in turn, paid the $200 and delivered the notes to plaintiffs, which they accepted; that subsequently plaintiffs redelivered the notes for collection to L. W. Gates, who placed them in the hands of G. W. Gates, with authority to collect them, and that G. W.

Gates did in fact collect the whole of said notes, except
$163 and interest on the last note; that in 1898 he wrote
to the plaintiffs, offering to pay this balance, and requesting
them to make him a deed to the land; that his letter was
answered by Lucy B. Floyd, who requested him to send her
a copy of his bond, and promised to make him a deed to
the land; and that subsequently, on the 3d of September,
1898, she again agreed to make him a deed,—and pleaded
that by these acts and transactions of plaintiff she was es-
topped from maintaining this suit.   He also pleaded that,
after he took possession of the land under his purchase, he
expended $2,025 in permanent and lasting improvements,
and prayed either for a specific enforcement of his contract
with L. W. Gates as agent, or that he be given a judgment
for the purchase money paid by him, with interest, and
for various sums of money alleged to have been expended
in improvements,—the whole amounting to $3,100.  Plain-
tiffs demurred generally to the answer, which was over-
ruled.   They thereupon filed a reply, in which they denied
all the statements of the defendant as to moneys expended
by him for improvements placed upon the land.   They also
denied that L. W. Gates had either written or verbal au-
thority from either of them to sell the land to the defend-
ant, or that he had in fact sold it to him, or that the defend-
ant had paid to him $200 in cash, or delivered to him the
four promissory notes set out in the answer.   They also
deny that L. W. Gates had, as their agent, or at all, author-
ized his son G. W. Gates to sell the land to the defendant,
or to execute the bond set up in the answer, binding them
to convey the land, or that he had power or authority to do
so.   They also deny that L. W. Gates had paid to them $200
upon the purchase price, or had delivered to them the
notes executed by defendant therefor.  They say that they

were in entire ignorance of this transaction until the receipt by them in 1898 of the note from defendant requesting that a deed be made to him for the land; that, upon receipt of the defendant's letter, in order to obtain further information as to his claim, they requested that he should send in the bond, so that they could examine it, with a view of determining its authenticity, and also to identify what part of the tract of land it referred to; that they never at any time agreed to execute a deed to him therefor. The pleadings were made up by rejoinder and sur-rejoinder.

It appears from the record that Plaintiff Lucy B. Floyd inherited from her father a large tract of unimproved land in McLean county about the year 1859, which she never saw, and which she managed through agents residing in McLean county. The greater part of this land had been sold or disposed of prior to 1885. For several years preceding the transaction with the defendant, Lloyd W. Gates, who resided in McLean county, acted as her agent in looking after her unsold lands, and as such paid the taxes thereon, rented them out, and sold a part of the land to a man named Ray, executing therefor a bond for a title, signed by him as agent. In 1883 or 1884 L. W. Gates moved from McLean county to Jefferson county, about 12 miles from Louisville, where he resided until his death, in 1890. After his removal to Jefferson county it appears that he made several trips back to McLean county, looking after unfinished business. In April, 1884, the appellee, J. H. Mackey, wrote to the appellant Mrs. L. W. Floyd, proposing to buy about twenty-nine acres of land in the tract of land in controversy. Mrs. Floyd inclosed this letter to L. W. Gates, and addressed to him the following communication: "Louisville, Ky., April 9. Mr. Gates: Inclosed find letter from Mr. Mackey, which we can not answer only through your judgment. Please

do what you consider best, or write your advice in the mat-
ter, and oblige, yours very respectfully, Lucy B. Floyd."
Plaintiff testifies that she never received any communica-
tion from L. W. Gates in response to this note. On the
23d of April, more than twelve months afterwards, G. W.
Gates a son of L. W. Gates, who resided in Owensboro, Ky.,
wrote and signed the following bond for a title: "For and
in consideration of the sum of $1,200,00,—$200.00 cash in
hand paid, the receipt of which is hereby acknowledged,
and the further sum of $1,000.00, to be paid as follows,
$250.00 first of May, 1886; $250.00 first of May, 1887; $250.00
first of May, 1888; $250.00 first of May, 1889,—for which J.
H. Mackey has executed to me his four promissory notes,
bearing date of the 23d of April, 1883, bearing six per cent.
interest from date, I have this day sold to him a tract of
land in McLean county, known as Lucy B. Floyd land, bound-
ed as follows: . . . I bind myself, as agent for Mrs.
Lucy B. Floyd, to execute to the said J. H. Mackey, or his
heirs and assigns, a good and valid deed to the said land
before the last-named note is paid by him; a lien being re-
tained on the land for the payment of said note. This
April 23d, 1885. G. W. Gates, Agent for Mrs. Lucy B.
Floyd." G. W. Gates, the son of L. W. Gates, testifies that
he prepared and executed this bond and took the notes of
the defendant for the unpaid purchase money as the agent
of L. W. Gates, who he thinks, was present at the time;
that he had no authority to represent Mrs. Floyd; that he
had a general impression that the cash payment was made
to his father, and that the notes were left by his father
with him for collection; that when they became due he
sent them to Frank Wright, a constable who resided in Mc-
Lean county, for collection; that Wright collected the
greater part of the notes from Mackey, and transmitted the

money to him, and that he thinks he paid the money over to his father before his death, in 1890, at his residence, in Jefferson county; that the payments were usually in cash, or by check upon a bank. He says, however, that he has no receipts or other evidence of these various payments to his father, and that he kept no books or memoranda of the transaction which would enable him to speak definitely as to the date or amount of such alleged payments; and no checks to his father are filed with, or made a part of his deposition. The defendant, Mackey, also testified as to transactions with L. W. Gates as agent of plaintiff Mrs. Floyd in connection with the sale of the land; but, as this testimony is clearly incompetent, we deem it unnecessary to consider it. But it is not denied that from the date of his purchase, in 1885, until the institution of this suit, in 1898, the defendant was in the undisturbed possession of the land in controversy, listing it for taxation, and claiming it as his property. The claim that L. W. Gates was in fact the agent of Mrs. Floyd, with authority to sell the land to the defendant, rests, in the main, upon the letter dated Louisville, Ky., April 9, addressed to him by Mrs. Floyd. And the deposition of G. W. Gates is the main prop to support the contention that L. W. Gates actually exercised the authority which it is alleged was conferred by the letter of April 9, whilst, on the other hand, Mrs. Floyd testifies that she never authorized L. W. Gates to sell the land and denies that she ever received any part of the purchase money, or ever heard of the transaction until she was written to by the defendant relative to the deed in 1898. She also testifies that she had no personal acquaintance with L. W. Gates, and that about 1884 or 1885 he wrote to her that he had determined to leave McLean county and take up his residence in Owensboro with his son, and that she

never heard of him after that date in any way, and was not aware of the existence of G. W. Gates. L. W. Gates, Jr., the youngest son of L. W. Gates, testifies most positively that his father did not leave his home, in Jefferson county, in the spring of 1885, and consequently could not have been present at the time G. W. Gates sold the land to the defendant. He also files an itemized statement of the account of his father with the appellant, as taken from his books, which were kept by his father in a very methodical and exact manner, which show that he began to act as the agent of appellant in June, 1877, and continued to act until July, 1882. He also testifies that he had made a careful examination of his father's bank account, and had in his possession all of the checks drawn by him between 1885 and 1890, and that no payments were made by him to appellant during this interval. This witness also testifies: That he found upon the book kept by his father, in his own handwriting, an account with his son G. W. Gates, beginning in 1883, at the time he left western Kentucky, and ending in 1890, the year of his death, which contains entries of every note and claim turned over to G. W. Gates for collection, giving the date of the notes or accounts, when payable, rate of interest, name of maker, amount of credits, and date of turning over same. This account contains a list of several hundred notes and accounts against various parties in McLean and adjoining counties, and was signed by G. W. Gates in his own handwriting. That the record shows that when these notes were collected by G. W. Gates, and the proceeds forwarded to his father, they were so entered upon the book. That this list contained no reference or mention of any notes or claims in which appellants had any interest, and that this was the only account between his father and

G. W. Gates. The testimony of L. W. Gates, Jr., is fully corroborated by that of his mother, Mrs. Alice Gates.

The first question to be determined is, did Mrs. Floyd ever in fact authorize L. W. Gates to sell the land, as her agent, to the defendant? And, second, did he in fact do so? The appellee, Mackey, in his letter to Mrs. Floyd in 1885, only proposed to purchase twenty-nine acres of her tract of land. This letter she referred to L. W. Gates, with instructions to do what he considered best, or to write his advice in the matter. The only question was the advisability of selling twenty-nine acres of the remainder of appellant's land. There is no contention that L. W. Gates sold the twenty-nine acres, but it is claimed that he sold the entire tract, of 129 acres, through his son, G. W. Gates. Agency is a personal trust for ministerial purposes, and can not be delegated; for the principal employs the agent upon the opinion he has of his personal skill and integrity, and the latter has no right to turn his principal over to another without his knowledge or consent. See 1 Am. & Eng. Ency. Law (2d Ed.), p. 368; Jones v. Brand, 106 Ky., 410 (20 R., 1997) (50 S..W., 679). It is clear that even if L. W. Gates had authority, either general or special, to sell the land to the defendant, he did not do so in person; and he had no right to delegate such authority, if in fact he did delegate it, to his son. The decided weight of the testimony is that L. W. Gates was not present at the transaction between his son G. W. Gates and the defendant, and that he never received any of the purchase money, which was undoubtedly paid by the appellee to G. W. Gates. It is unreasonable to believe that the account books of L. W. Gates should have contained an exact record of every transaction between himself and his son from the time he left western Kentucky and moved to Jefferson county, except that growing out of the

Floyd and Wife v. Mackey.

sale of appellant's land. The testimony is undisputed
that he was an honest, methodical, and exact business man;
and the fact that he resided within twelve miles of appel-
lant, and was frequently in the city where she resided from
1884 until his death, in 1890, certainly raises a strong pre-
sumption that he had no money in his possession belonging
to her. As G. W. Gates was not the agent of appellant,
she was not bound in any way by his acts.

But it is contended for appellee that as Mrs. Floyd au-
thorized and permitted L. W. Gates, in numerous transac-
tions which preceded the one in question, to represent her
in the sale of parts of her tract of land in McLean county
under precisely similar circumstances to those under which
appellee bought the land claimed by him, and subsequently
ratified his acts by making conveyances, and referred appel-
lee's letter, seeking to buy the twenty-nine acres of land,
to him, she is estopped to deny his authority in the prem-
ises, or to assert title to the land in controversy. Even if
L. W. Gates had, as a matter of fact, sold the land to ap-
pellee (which the record fails to show), the facts relied on
would not be sufficient to estop Mrs. Floyd from claiming
the land in controversy. Undoubtedly the active participa-
tion of a married woman in the perpetration of a fraud may
operate, by way of estoppel, to divest her of interest in real
estate. See Connolly v. Branstler, 66 Ky., 702, 96 Am. Dec.,
278; Heck v. Fisher, 78 Ky., 644; Newman v. Moore, 94 Ky.,
147, (15 R., 1, 21 S. W., 759, 42 Am. St. Rep., 343). And if
appellant had in fact received the purchase money of this
tract of land, or had knowingly ratified and approved its
sale, by accepting the notes and sending them to G. W.
Gates for collection, the doctrine of equitable estoppel *in
pais* might be invoked, unless she refunded the money.

But there is no evidence that she actively participated in the fraud practiced upon appellee in the sale of the land to him, or that she ever subsequently, by any act of hers, ratified or approved the sale; but, on the contrary, we think the evidence clearly demonstrates that she had no connection with G. W. Gates at any time with reference to the land, or ever received the cash or notes executed for the purchase money. We do not deem it important to review the transaction between appellant and appellee after his letter of 1898 requesting a deed for the land. Appellant and appellee differ as to what occurred in the interview between them with reference to this matter, and the statements of appellant are fully corroborated by the testimony of her attorney, who was present. But in view of the fact that appellee has acted in good faith throughout this transaction, and has expended considerable sums of money in improvements upon the land, which will probably add to its vendible value, we are of the opinion that he is equitably entitled to have refunded to him such an amount as these improve ments have permanently increased the salable value of the property. See Pom. Eq. Jur., (2d Ed.), sec. 1241. And as suggested by counsel for appellant, the chancellor, upon the return of the case, should require appellee either to surrender the land upon the condition mentioned, or pay the purchase money, with interest from the day of the sale; the rents being equivalent to the interest.

For the reasons indicated, the judgment is reversed, and the cause remanded for proceedings consistent with this opinion.