## Loeb, et al. v. Conley, et al.

(Decided October 6, 1914.)

### Appeal from Morgan Circuit Court.

1. Deeds—Constructive Notice—Effect of.—The constructive notice furnished by a recorded instrument, in so far as the boundary of land and every other material fact recited therein is concerned, is equally as conclusive as would be actual notice acquired by a personal examination of the recorded instrument or actual notice acquired by or through other means.

2. Deeds—Description—Sufficiency of.—When a deed or other like instrument furnishes on its face marks by which the land intended to be embraced in it can be identified, or marks which are sufficient to put a prospective purchaser upon notice, it will be deemed sufficient to estop the purchaser from asserting that the description was too indefinite or insufficient to give notice of the land conveyed by the instrument.

3. Deeds—Description—Necessity For.—The description of land in a writing is an essential part of the instrument, and if the description is so insufficient that the land cannot be identified, the instrument will not furnish the constructive notice sufficient to charge innocent purchasers or lessees, and will be indeed void as to them.

4. Deeds—General Description—Special Description—Which Controls.—Where the general description is so vague and indefinite that the land cannot be identified except by reference to a special description, the special description will control; or where there is a general description and the special description expressly declares that it is only intended to convey the land described in the special description, it will control. But, generally speaking the special description will be treated merely as an addition to the general description.

5. Deeds—Effect of Statute Requiring Source of Title to be Stated.—Section 495 of the Ky. Statutes provides that all recorded instruments shall specify the source of title in the grantor, but the failure of a deed to so recite does not affect the validity of the conveyance.

6. Deeds—Recordability of Non-Enforcible Contracts.—An instrument otherwise recordable, may be non-enforcible between the parties for fraud or no consideration or other infirmity, but this does not deprive it of its character as a recordable instrument.

7. Improvements—When Ejected Improver Entitled to Compensation.—A person who enters upon land in the good faith belief that he is the owner of it, is entitled, if dispossessed, to be compensated for improvements made by him while believing, in good faith, that he was the owner, to at least the amount that the improvements have increased the vendible value of the land. If, however, the improvements are not made by a person while acting in the good faith belief that he was the owner, or if they

are made with actual notice of an adverse, superior claim, especially after this adverse claim has been asserted in a suit, the person making the improvements will not be entitled to compensation.

8. Good Faith—Question of Fact—Defined.—The question of good faith is a question of fact, and whether a person acts in good faith, which involves an honest belief in the correctness of his position, depends on the circumstances surrounding the transaction. The mere personal belief of the person affected that he acted in good faith is not conclusive and will not alone entitle him to the advantage of a person occupying a position of good faith.

JOHN B. PHIPPS, J. J. C. BACH, GRANNIS BACH and O'REAR & WILLIAMS for appellants.

S. M. NICKELL and FOGG & KIRK for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

In May, 1912, A. E. Sebastian and his wife leased by a written instrument to the appellee, M. L. Conley, a tract of land in Morgan County described in the lease as follows:

"On the waters of Prater Fork, of Caney Creek, bounded substantially as follows: On the north by the lands of Mason Jones; on the east by the lands of Mason Jones; on the south by the lands of Willie Sebastian; on the west by the lands of Mason Haney, containing 40 acres, more or less, and being the same land conveyed to the first party by Daniel McGuire, et al., by deed bearing date October 23, 1911."

The land thus described was leased by Conley for the purpose of exploring it for oil and gas, and if either of these products was discovered by the boring of wells, Conley was to pay to Sebastian a royalty specified in the lease. This lease, after being signed and acknowledged by the lessors, was recorded in the clerk's office of Morgan County in September, 1912. In October, 1912, Sebastian and his wife leased to the appellants, Norman and Fred Loeb, a tract of land in Morgan County, described in the lease as being bounded "on the north by lands of L. M. Haney; on the east by lands of Mason W. Jones; on the south by lands of J. T. Fugate; on the west by lands of J. T. Fugate and L. M. Haney, containing 12 acres, more or less, and being the same land conveyed to the first parties by Noah McGuire and wife."

This land was also leased to the Loebs for the purpose of exploring it for oil and gas. This lease was put to record in the proper office in November, 1912.

In April, 1913, Conley and other parties, to whom he had assigned an interest in the lease, brought their suit in equity against the Loebs and A. E. Sebastian, charging that the land leased by Sebastian in October, 1912, to the Loebs was included in the boundary of land leased by Sebastian to Conley in May, 1912; that the Loebs, with actual as well as constructive notice of the lease to Conley and the boundary of land that it described, procured from Sebastian, in fraud of their rights, the lease executed to them in October, 1912, and that the Loebs were asserting an interest in the land by virtue of their lease and threatening to drill oil and gas wells on the land described in their lease and appropriate the oil and gas that might be found to their own use. They asked that the Loebs be enjoined from entering upon the land described in the lease to them and from drilling any wells on the land; that their lease be canceled and the title of Conley and his lessees to the land claimed by the Loebs be quieted. In an amended petition subsequently filed it was set up that the Loebs had bored some oil-producing wells on the land leased to them and from these wells had obtained a large quantity of oil, and they asked judgment against the Loebs for the value of the oil produced in these wells and sold by the Loebs.

It further appears that in August, 1913, another amended petition was filed in which it was set up that the defendants had entered upon the land in controversy and drilled oil-producing wells from which the defendants were taking oil. In this amended petition there was a prayer that a receiver be appointed to take charge of the lease and lands in controversy and operate the same until the rights of the parties were finally adjudicated.

In November a motion was made before the judge of the Morgan Circuit Court for the appointment of a receiver, and pending the disposition of this motion it was agreed by the parties that the Loebs would execute to Conley a bond conditioned that they would perform the judgment of the court by paying to the plaintiff such sums of money as might be adjudged to him. In accordance with this agreed order the Loebs executed the bond required in the order.

The Loebs, in their answer, averred that they leased the land described in their lease from Sebastian in good faith and for a valuable consideration, without either actual or constructive notice that it was embraced in the land leased to Conley. They further averred that at an expense of some sixteen thousand dollars they had sunk several wells on the land leased to them by Sebastian, and prayed that in the event it should be adjudged that they were not entitled to the land described in their lease, they be adjudged a lien on the land for the amount expended by them in drilling the wells.

Sebastian also filed an answer in which he set up in substance that there was only leased to Conley, as Conley well knew, the land that had been conveyed to Conley by Daniel McGuire, and that he did not intend to lease, nor did he lease, to Conley the land conveyed to him by Noah McGuire, which land he subsequently leased to the Loebs.

Other pleadings were filed by the parties, but what we have set out is sufficient to illustrate the issues between them.

After the case had been prepared for trial by the taking of a number of depositions, it was submitted for hearing, and the court adjudged that Conley and his associates were entitled, under the lease to Conley, to the exclusive right to the oil and gas on the tract of land described in the judgment, which included both the Daniel and Noah McGuire tracts.

It was further adjudged that their title to this body of land, which embraced the land described in the deed to the Loebs, should be quieted and that the Loebs be "restrained from entering upon said land or removing any oil or gas therefrom." It was further adjudged "that the Loebs entered on the land in controversy and drilled and operated for oil and gas thereon with both actual and constructive notice of plaintiffs' ownership thereof, and not in good faith, and that all of said operations were done after defendants had both actual and constructive notice of plaintiffs' ownership, and that the drilling and operating thereon by the defendants has not in any way enhanced the value of said property to the plaintiffs, and, therefore, adjudges that the defendants recover nothing on their counterclaim herein, and the same is dismissed. It is further adjudged that the plaintiffs recover of the defendants Loeb the sum of $2,400 for the oil taken and appropriated by them from

the tract of land in controversy, with interest thereon from this date.''

From this judgment the Loebs prosecute this appeal, insisting, first, that they should be adjudged entitled to all the rights conveyed in the lease made to them by Sebastian, which would of course include the right to enter upon the land described in this lease and sink wells and appropriate for their own use and benefit the product of the wells so sunk; but that if not entitled to this relief, they should at least have compensation for the value of the improvements placed by them on this land, which improvements consisted of wells that had been sunk by them pending this controversy.

It will be observed that the principal question in this case is, did the Loebs acquire under the lease to them the rights and interests in the land specified in the lease? If they did, of course the judgment should be reversed in its entirety, for if this lease conveyed to them the rights and interests it purported to convey, they had the right to enter upon the land, sink wells thereon and appropriate to their own use the product of these wells.

Taking up first this main question, it appears from the evidence that, although the lease to Conley recited that the boundary of land described in the lease contained forty acres, more or less, it in fact contained only about thirteen acres, and that, although the lease to the Loebs recited that the boundary of land therein described contained twenty acres, more or less, it in fact contained only about five acres.

It further appears that the land described in these two leases, although lying in one body, was purchased by Sebastian from two different parties and conveyed to him by two separate deeds; the land leased to Conley having been conveyed to Sebastian as recited in the lease by D. B. McGuire, while the land leased to the Loebs, as recited in the lease, was conveyed to Sebastian by Noah McGuire.

It also appears that the deed made by D. B. McGuire to Sebastian was signed and acknowledged by the grantor in October, 1911, and recorded in the proper office in November, 1911, and that the deed from Noah McGuire to Sebastian was made in November, 1911, and recorded in November, 1912.

We also think the weight of the evidence shows that the Loebs, at the time they took the lease from Sebastian, had no actual notice of the claim of Conley that the

lease to him included the land that they leased. They had been informed by Sebastian that he had not leased the land he proposed to lease them to Conley or any one else, and had the right to believe what he told them.

A good deal is said in the record about the preliminary negotiations between Conley and Sebastian that culminated in the execution of the lease, but we regard all of these verbal negotiations as wholly immaterial in disposing of this case. It is not important what land Sebastian thought he was leasing to Conley or how much land Conley thought he was leasing from Sebastian. Conley and Sebastian put their contract into writing in the form of a recorded lease, and by the terms of this instrument the rights of Conley and the Loebs are to be determined. The Loebs had no notice or information at the time they took their lease of what had transpired between Conley and Sebastian, and so they are only to be charged with notice of that which the law charged them with notice of, and that is the recorded lease made by Sebastian to Conley.

So that the question is, did this recorded lease furnish to the Loebs at the time they took their lease constructive notice that it included the land Sebastian proposed to and did lease to them?

The lease to Conley described the land leased as containing "40 acres, more or less," and bounded "on the north by the land of Mason Jones, on the east by the land of Mason Jones, on the south by the lands of Willie Sebastian, and on the west by the lands of Manson Haney." That this general boundary did not accurately describe the land owned by Sebastian and which it is claimed he leased to Conley, is admitted. The lease describes the land as bounded on the north by the lands of Mason Jones, and it is so bounded. It describes the land as bounded on the east by the lands of Mason Jones, when in fact it is bounded, speaking in a general way, on the east by the land of W. A. Sebastian. It describes the land as bounded on the south by the land of Willie Sebastian, when in fact it is bounded, generally speaking, by the lands of T. J. Fugate and H. C. Keeton. It describes the land as bounded on the west by the lands of Manson Haney, and this is true if this lease embraces the land conveyed to Sebastian by Noah McGuire, because the land conveyed by Noah McGuire to Sebastian is bounded on the west by the land of Manson Haney and on the east by the land conveyed to Sebastian by D.

B. McGuire. In short, the Noah McGuire land lies between the Manson Haney land on the west and the D. B. McGuire land on the east.

We have said that, generally speaking, this tract may be said to be bounded on the east by the land of W. A. Sebastian, and, so speaking, on the south by the land of Fugate and Keeton, although, accurately speaking, according to the surveys, the land of Mason Jones would touch a part of this tract at an angle on the east and the land of W. A. Sebastian would touch it at an angle on the south. This, however, is not so material, because any person looking over the land on the ground would say that it was bounded on the east by the land of W. A. Sebastian, and on the south by the land of Keeton and Fugate.

But whatever errors or omissions there may be in the boundary of this tract of land, speaking of the D. B. McGuire tract and the Noah McGuire tract as one, there remains the undisputed fact that this land was bounded in the lease on the west by the land of Manson Haney, and that it could not have been bounded on the west by the land of Haney unless there was included in the lease the Noah McGuire land now claimed by the Loebs. Therefore, this lease furnished express and accurate notice of its western boundary. And this information was, we think, sufficient to put any person upon notice that the lease extended on the west to the land of Manson Haney.

Suppose that one of the Loebs after looking over the land on the ground and then after being told by Sebastian that he had leased a part of it to Conley and wanted to lease to him the remainder, had gone to the clerk's office and examined the lease, he would at once have discovered that the Conley lease extended on the west to and was bounded on the west by the land of Manson Haney, and, therefore, included all of the land owned by Sebastian. He would further have discovered that the land covered by this lease was bounded on the north by the lands of Mason Jones, and these two accurate boundaries, or indeed one of them, would have been sufficient to put him on notice that Sebastian could not lease to him any land between the Conley lease and the land of Mason Jones on the north, or between the Conley lease and the lands of Manson Haney on the west. But does the fact that the Loebs did not have this actual

notice or any actual notice of the extent or boundary of the lease to Conley affect their standing? We think not.

The law makes no difference between the constructive notice that this Conley lease furnished to the Loebs and the actual notice that an examination of the lease on record in the clerk's office, or from other sources, would have furnished them. Although they never saw this lease and did not know of its existence at the time of the lease from Sebastian, the law charged them with notice of it and charged them with notice of the description of the land and with notice of the persons whose lands adjoined it, as set out in the lease, and with every other material thing that the recorded lease recited. The constructive notice furnished by a recorded instrument, in so far as the boundary of the land and every other material fact recited therein is concerned, is equally as conclusive as would be actual notice acquired by a personal examination of the recorded instrument or actual notice acquired by or through other means. Every person must take notice of its contents to the same extent as if he had personal knowledge of every fact that it recites. This is the very purpose of our recording laws. Tiedman on Real Property, section 584, 39 Cyc., 1718.

It is said, however, that the recited description in the recorded lease is so uncertain that it did not furnish such information as would charge the Loebs with notice of the exterior boundary mentioned in the lease or with notice that it embraced the Noah McGuire land, and, therefore, they are to be treated as innocent and *bona fide* lessees, and their right to the Noah McGuire land is not affected by this lease. But the difficulty with the case for the Loebs is that the record does not support this assumption. The Conley lease did, as we think, furnish ample notice to them that Sebastian did not own any land west of the land leased to Conley and between the Conley lease and the Manson Haney land. This lease plainly recited that the land therein described was bounded on the west by the land of Manson Haney. This being so, the Loebs could not have been misled or deceived into the *bona fide* belief that Sebastian owned land adjoining on the west the land of Haney that had not been leased to Conley. The lease to them bounded the land on the west by the land of Haney, when the Conley lease showed that Sebastian had leased to him his land bounded on the west by the land of Haney.

The description in the lease was of course not accurate or full, nor was it necessary that it should be in order to give notice of the land covered by the lease. When a deed or other like recorded instrument furnishes on its face marks by which the land intended to be embraced in it can be identified, or marks which are sufficient to put an intended purchaser upon notice, it will be deemed sufficient to estop the purchaser from asserting that the description was too indefinite or insufficient to give notice of the land conveyed by the instrument. So that when this lease to Conley furnished notice that the western boundary touched the land of Manson Haney, it furnished sufficient notice to put the Loebs upon inquiry and to warn them that Sebastian did not own any land between the land leased to Conley and the land of Manson Haney.

We recognize the rule of law that the description of the land in a writing is an essential part of the instrument, and if the description is so insufficient as that the land can not be identified, the instrument will not furnish the constructive notice necessary to charge innocent purchasers or lessees, and will indeed be void as to them. In other words, as said by Tiedman on Real Property, section 590:

"If a description is hopelessly uncertain, so that the thing granted can not be ascertained from the deed with any reasonable degree of certainty, the deed will be void. But if it is possible to gather the intention from the description by any reasonable rules of construction, it will be enforced, it matters not how general the description may be."

Measured by these rules which have been applied by this court in many cases, including Campbell v. Preece, 133 Ky., 572; Brice v. Hays, 144 Ky., 535; Bates v. Harris, 144 Ky., 399, the description was sufficient to identify the land and put the Loebs on notice of the boundary line, unless it be, as argued, that this general description is controlled and limited by the recital in the lease that it was "the same land conveyed to the first party by D. B. McGuire by deed dated October 23, 1911." We do not, however, think that the boundary described in this lease was intended by the parties to or should be limited by the reference to this D. B. McGuire deed. The general description shows very plainly that it was intended by this instrument to lease the land described in this general boundary, and the reference to the D. B. Mc-

Guire deed can not have the effect of limiting this general description. Stark v. Spalding, 19 Ky. L. R., 181.

Where the general description is so vague and indefinite as that the land can not be identified except by a reference to a special description, then this special description will control; or where there is a general description and the special description expressly declares that it is only intended to convey or lease, as the case may be, the land described in the special description, it will control. But generally the special description will be treated merely as an addition to the general description for purposes of better identification and not as a limitation. Or, as said by Jones on Conveyancing, section 413: "Such a reference to a prior deed after a full description does not alter or change such description in any way, but is regarded as having been inserted for the purpose of showing the grantor's chain of title."

It was said in Plummer v. Gould, 92 Mich., 1, 31 Am. St. Rep., 567, that "The intention of the parties, as gathered from the whole instrument, will control; and in case of a general description followed by a clause summing up the intention of the parties as to the premises conveyed, it has a controlling effect upon all the prior phrases used in the description."

And this rule of construction appears to us to be sound. It is an effort to get at the intention of the parties as this intention may be gathered from the instrument itself, and we think it is manifest from a reading of this instrument with its general boundary and specification of the number of acres, that it was the intention to lease the land contained within the described boundaries and that the reference to the D. B. McGuire deed was either inserted for the purpose of better identifying the land or for the purpose of furnishing a chain of title in an attempt to conform to section 495 of the Kentucky Statutes.

This section provides in substance that all instruments which are to be recorded to be effectual against purchasers and creditors shall specify and refer to the next immediate source from which the grantor therein derives title to the property conveyed.

But the failure to specify and refer to the next immediate source from which the grantor derived title does not affect the validity of the deed, as it is expressly provided, "Nor shall anything in this act be construed

to invalidate any deed lodged contrary to the provisions hereof.''

As said in McPherson v. Gordon, 96 S. W., 791, and Perkins v. J. M. Robinson, Norton & Co., 124 S. W., 310: ''The only purpose of this amendment was to make it more convenient and easy for purchasers of real estate to trace the title thereto, and to avoid impositions and losses.  *  *  *  The violation of it, however, does not prevent the title to the real estate from passing from the grantor to the grantee.'' So that the failure of this lease to state that Sebastian acquired a part of the land described in the lease from Noah McGuire did not affect its validity or in any manner change the doctrine of constructive notice as applicable to instruments like this.

It follows from these views that the lease to Conley was not void for uncertainty and that it furnished to the Loebs notice that the land they subsequently leased from Sebastian was included in the boundary described in this Conley lease.

Another contention is that the lease from Sebastian to Conley was not a recordable instrument, because it was, as is said, void for want of mutuality. It is not necessary to consider at all the question as to the lack of mutuality in this contract, because if it should be assumed that it was not enforceable as between Sebastian and Conley for this reason, this would not affect its recordability. An instrument otherwise recordable may be non-enforceable for fraud or want of consideration or other infirmity, but this does not deprive it of its character as a recordable instrument. Section 494, of the Kentucky Statutes, provides for the recording of leases like this, and so any lease of oil, gas, coal or mineral right or privilege that is duly signed and acknowledged may be recorded, although it might be void as between the parties on account of some vice in its execution or infirmity in its terms or conditions.

The other question to be considered is, should the Loebs be compensated for the full amount, or any part of the amount, expended by them in boring wells on this Noah McGuire land? We have had more difficulty with this branch of the case than the other, but, after giving to it very careful consideration, our conclusion is that the Loebs are not entitled to any compensation, and will proceed to state the facts as well as the authority that have induced us to come to this conclusion.

The Loebs sunk on the land, for which they had a lease from Sebastian, two oil-producing wells. They also sank a third well, but this well was not an oil-producing well, although it furnished a supply of water that the evidence shows to be useful in oil operations such as were being conducted in this territory. A fourth well was sunk a considerable distance, but before a depth that would produce oil was reached operations were stayed by the proceedings instituted in this case. The evidence shows that the usual cost of digging wells like these was something like four thousand dollars a piece, perhaps a little more, and that the Loebs, who were experienced oil men, expended approximately this amount of money on these wells, is not disputed; nor is it questioned that the two oil-producing wells are valuable, although there is difference of opinion as to the value of the well in which water and not oil was found, and whether the well that was not sunk deep enough to reach oil would be productive, is somewhat problematical.

The evidence for the Loebs, confining what we have to say to the two oil-producing wells, is also to the effect that the sinking of these two wells, at the time and places they were sunk, was necessary to protect as well as to develop the land they leased from Sebastian; and it further shows that these wells enhanced the vendible value of this land.

On the other hand, the evidence for Conley, based on the assumption that he owned the land covered by the Loeb lease as well as the land leased to him, taken in connection with other leases that he and his associates had in that immediate territory, is that these wells were not necessary to the development of the land, and in place of being benefited by these wells, their sinking subjected him to a great deal of unnecessary cost and trouble. If, however, it should be assumed that these wells added to the vendible value of the property, and that one of them at least was necessary to its protection and development, it would not, for reasons that will be hereafter stated, affect our decision.

It is the further contention of the Loebs that all of these wells were sunk by them under the good faith belief that their leases gave them the right to develop this property in the time and manner they did, and it is strongly urged on their behalf that as they acted in good faith, under the *bona fide* conviction that they were the rightful lessees of the land, and that as these oil-produc-

ing wells were necessary to its development, Conley should not be permitted to receive the benefit of their labor and money without compensating them at least to the extent that he has been benefited by the boring of the wells.

The question of the good faith of the Loebs in boring these wells, or, in other words, whether they honestly believed and had reasonable grounds to believe that they had the right, by virtue of their lease, to develop the property by boring these wells, is the controlling issue upon which their right to compensation must stand or fall, and this is a question of fact. Whether a person acts in good faith, which involves an honest belief in the correctness of his position, depends on the circumstances surrounding the transaction. The mere personal belief of the person affected that he acted in good faith and honestly believe that he was right in the position assumed is not conclusive of the question and will not of itself entitle him to the advantage of a person occupying a position of good faith. The court, in determining this question, will look into all the facts and circumstances surrounding the party and decide from them whether he was acting in good faith and under an honest conviction that he was right in his assumption. In 20 Cyc., page 1260, and in the note to Jackson v. Loomis, 15 Am. Dec., 347, there will be found numerous cases on this subject.

We also regard it as well settled by the authorities that a person who enters upon land in the good faith belief that he is the owner of it, is entitled, if dispossessed, to be compensated for improvements made by him, while believing in good faith that he was the owner, to at least the amount that the improvements have increased the vendible value of the land. Chiles v. Patterson, 1 A. K. Mar., 444; Parker v. Stephens, 3 A. K. Mar., 197; Bell v. Barnett, 2 J. J. Mar., 516; Thomas v. Thomas, 16 B. Mon., 420; Proctor v. Smith, 8 Bush, 81; Hawkins v. Brown, 80 Ky., 186; Floyd v. Mackey, 112 Ky., 646; Darnall v. Jones, 24 Ky. L. R., 2090.

If, however, the improvements are not made by a person while acting in the good faith belief that he is the owner of the land, or if they are made with actual notice of an adverse superior claim and especially after this adverse claim has been asserted in a suit, the person making the improvements will not be entitled to compensation. For example, in Barlow v. Bell, 1 A. K. Mar.,

246, Barlow sought to recover for improvements, and the court, in denying him relief, said:

"As the appellant Barlow is shown to have had a perfect knowledge of the appellee Bell's title, and was advised of the consequences of a purchase from the agent of William Bell, before he made the purchase, he can not be viewed in the favorable attitude of a *bona fide* possessor, so as to warrant the decree of a court of equity in his favor, for improvements made upon the land."

It further said that to entitle one claiming for improvements to recover, "it is not enough that the possessor shows himself to have meliorated the land, but his money and labor must be bestowed under an honest conviction of his being the rightful owner of the land. For, if he takes possession without title, and knowing the land belongs to another, he is himself guilty of a wrong; and although he may have expended his money, and bestowed his labor, his claim for compensation ought not to be sanctioned by a court of equity."

In Harrison v. Fleming, 7 T. B. Mon., 537, and again in Harrison v. Baker, 5 Litt., 250, it was held that where persons make improvements with actual knowledge of the assertion of an adverse claim to the land, they can not recover for the improvements. To the same effect are Singleton v. Jackson, 2 Litt., 208, and Wade v. Keown, 25 Ky. L. R., 1787.

In Upton v. Handley, 123 S. W., 1188, in denying a recovery for improvements, the court said: "At that time they knew that their title to the property had been attacked. If parties holding property under such circumstances should be credited with the value of the improvements, it would put it in their power to improve the property in such way as practically to defeat a recovery. We are of the opinion that the only relief to which appellees are entitled, so far as the additional improvements are concerned, is the right to remove them from the lot in question."

In Leavison v. Harris, 12 Ky. L. R., 488, the court again denied a recovery for improvements and said: "The appellants having had notice of the appellee's claim to the land, they thereafter built the wall upon it at their peril. And the court having found the appellee's contention to be true, the appellants will not be heard to say that, as they did not believe the appellee's

contention to be true, they are entitled to recover under the occupying claimant's law.''

In Bennett Jellico Coal Co. v. East Jellico Coal Co., 152 Ky., 838, in rejecting the claim of the appellee for the value of improvements, it is said: ''Whether valuable or not, if appellee, at the time the tracks were being so laid and the mine so propped, had actual notice of appellant's ownership, it is in no position to complain, for it is well settled, by a long line of decisions, that where one, without the consent of the owner, makes improvements upon another's property, he does so at his peril, and, except under extraordinary circumstances, will be allowed neither to remove the improvements so made nor to receive compensation therefor.'' To the same effect are Taylor v. Whiting, 9 Dana, 399; Patrick v. Marshall, 2 Bibb., 40; Henderson v. Pickett, 4 T. B. Mon., 54.

In Deffeback v. Hawke, 115 U. S., 392, 29 Law Ed., 423, the Supreme Court said: ''There can be no color of title in an occupant who does not hold under any instrument, proceeding, or law, purporting to transfer to him the title or to give to him the right of possession. And there can be no such thing as good faith in an adverse holding, where the party knows that he has no title, and that, under the law, which he is presumed to know, he can acquire none by his occupation.''

There are some cases holding that there may be a recovery for improvements made in the good faith belief of ownership, although they were made after the party making them had actual notice of the adverse and subsequently successful title of another to the property. Among these is Searl v. School District, 133 U. S., 553, 33 L. Ed., 740, in which the Supreme Court held, under very exceptional circumstances, that the improver should be compensated.

Other cases are Whiteledge v. Wait, Sneed (Ky.), 335; Bell v. Barnett, 2 J. J. Mar., 516; Bell v. Barnett, 7 J. J. Mar., 379, in which the improver was allowed compensation for improvements made subsequent to actual notice of adverse title and even after the institution of proceedings in which the improver was evicted. But in these cases the improvements were set off against the rents.

With this understanding of the law applicable to the case we will now look to the facts for the purpose of determining whether these wells were bored by the

Loebs in the good faith belief that they were the rightful occupants of this land under their lease from Sebastian. In disposing of this question we will leave entirely out of view the constructive notice furnished to the Loebs by the recorded lease of Conley, and further assume that when they took their lease from Sebastian they, in good faith, believed that Sebastian had the right to make the lease; thus narrowing the question down to the effect of the actual notice of Conley's superior title before the expenditure of money in making the improvements.

Fortunately there is little material dispute about the facts as to actual notice. After the Loebs had secured the lease from Sebastian, but before they had expended any money in improvements or in boring these wells, they not only had actual notice of the assertion of Conley's claim but actual notice of the existence of Conley's lease, and there had been tendered back to them by Sebastian the money they paid to him for the lease. After receiving this actual notice and rejecting this tender, they proceeded to commence operations, but had only expended a few dollars before Conley brought this suit against them, in which he prayed that their lease be cancelled and that they be enjoined from entering upon the land or operating thereon for oil or gas or from interfering with him in any way in the development of the land. Therefore, we may safely say from the record that all of the improvements for which the Loebs now seek compensation were made not only after they had actual notice by the service of process of this suit, but actual notice of the existence of Conley's lease, and this lease, as we have said, furnished to them notice of the prior and superior claim and title of Conley to this land. Under these circumstances we think that the Loebs did not make these improvements in the good faith belief that they had the right to make them, and so are not entitled to compensation.

We do not of course mean to say that the mere fact of notice of an adverse claim, or indeed the pendency of a suit asserting an adverse claim, would be conclusive of the question that the improver had not acted in good faith, for the improver might be honestly of the opinion, based on reasonable ground, that his contention was right, notwithstanding notice of an adverse claim and the pendency of a suit to enforce it. Searl v. School District, *supra.* But when there is, taken in connection

with the actual notice of an adverse claim and the pendency of a suit asserting it, actual notice of a recorded instrument that shows on its face the superior ownership of the adverse claimant, there is no ground left on which to rest the plea of good faith.

The Loebs spent a large sum of money in these improvements, but they took the chance of losing it, with their eyes open to every fact needed to put a reasonable person on notice of the risk he was taking, and we know of no equitable principle that would allow compensation under the circumstances shown in this record.

Wherefore, the whole court sitting, the judgment of the lower court is affirmed.