Simon **LEBOW** et al., Appellants,

v.

H. B. **CAMERON** et al., Appellees.

Ruby E. **ORVIS** et al., Appellants,

v.

J. P. **JOYCE**, Administrator, et al., Appellees.

Court of Appeals of Kentucky.

June 25, 1965.

As Modified on Denial of Rehearing
Nov. 12, 1965.

William G. Craig, Sandidge, Holbrook, Craig & Hager, Owensboro, Robert Matthews, Matthews & Matthews, Shelbyville, for appellants.

Thomas E. Sandidge, Sandidge & Sandidge, Owensboro, for appellees.

DAVIS, Commissioner.

These consolidated appeals present a third episode in the litigation which has been treated in two prior opinions of this court. See, Cameron v. Lebow, Ky., 366 S.W.2d 164 (1962), and Cameron v. Lebow, Ky., 338 S.W.2d 399 (1960). The background facts are stated in the two opinions just cited, but we briefly recapitulate them here for convenient reference.

An oil and gas lease covering 160 acres in Daviess County was executed in 1938. In 1939 the appellees (to whom we shall refer as Cameron) became lessees as to 55 acres of the original leasehold. That same year Cameron drilled a "dry hole" on the 55 acres, but took no further steps looking toward exploitation of the oil and gas. Meanwhile, producing wells had been brought in by others on the remaining 105 acres of the original 160 acres of the lease; the only significance of that fact is that the production on the 105 acres absolved Cameron from pursuing production on the 55 acres until notice and demand for production should be given.

In 1956 the appellants (to whom we shall refer as Lebow) took a lease (designated as a "top" lease because of its being subsequent to and on "top" of the Cameron lease) on the same 55 acres. Lebow caused title examination to be made by legal counsel, and was advised by the attorney of the existence of the Cameron lease. However, the title examiner advised that in his opinion the Cameron lease had been "completely forfeited." In another reference, the title lawyer referred to the Cameron lease as having been "abandoned." The title attorney obtained an affidavit and a lease from E. W. Richmond, who had been an owner of the lessor interest. Richmond's affidavit recited that no production activity had been performed by Cameron since 1939; the lease taken from Richmond was precautionary and in the nature of a quitclaim.

Lebow drilled a dry hole on the 55 acres between the 13th and 17th of September,

1956. On September 28, 1956, Cameron first learned of Lebow's activities, and this knowledge was acquired from H. W. (Warren) Hartsough under these circumstances, as related by Cameron:

"Q. 47. And how did you learn that at that time?

A. 47. I learned it from Warren Hartsal. (sic)

Q. 48. Under what circumstances?

A. 48. Warren came to take me to the airport.

My wife was dying.

Q. 49. Where was your wife?

A. 49. She was in Cleveland.

Q. 50. Had your wife been sick for sometime?

A. 50. Yes, she had, pretty near two years and I had been paying attention to her and no attention to things down here like I should have, I presume, but Mr. Richmond never told me or notified me or anything that there was anything going on over there. I knew Warren was drilling over in that section, but I thought he was clear over to the other side of the woods. I didn't have any idea that he was as close as that, and he said to me, I was packing and wasn't quite ready when he came to take me to the airport. I want to tell you that he was very nice to me and he said to me, 'we are drilling a well on the Davis.'

Q. 51. Was that while you were on the way to the airport or before you left home?

A. 51. That was right in my house and I said to him, 'the Davis,' and he said, 'yes,' and I said, 'that is our lease, Warren,' and he said, 'the lawyers down town say it is not,' and that is all the conversation there was about it at that time.

\* \* \* \* \* \*

Q. 55. What did you say to Warren when he told you that they were drilling a well on the Davis?

A. 55. Didn't say a word except I told him that it was our lease. Warren has been a very nice friend of mine, I will say that."

Cameron consulted with attorneys with a view to suing Lebow, and was so discouraged as to the prospect of success he "had decided to abandon it," but ultimately did file the suit on August 19, 1957. The present appeal and the two former appeals heretofore mentioned arose from that suit.

Meanwhile, on October 15, 1956, Lebow began drilling a second well; it was an oil producer, and was completed and put on pump on November 2, 1956. Shortly after the suit was filed Lebow drilled and completed a third well, which also was commercially productive of oil. This well was completed between August 25 and 30, 1957, (just a few days after the suit was filed on August 19, 1957).

The circuit court dismissed Cameron's complaint, but this court reversed that judgment and remanded the cause to the circuit court for a trial on the merits to determine whether the Cameron lease had been abandoned. Cameron v. Lebow, Ky., 338 S.W.2d 399. When the matter was tried on its merits the circuit court found that the Cameron lease had been abandoned and that Lebow had acquired the "top" lease as bona fide purchasers. We reversed in Cameron v. Lebow, Ky., 366 S.W.2d 164, holding that the Cameron lease had not been abandoned.

When the case came before the circuit court following the opinion in 366 S.W.2d 164, the issues were limited to (1) accounting for the proceeds of the oil taken from the property by Lebow, and (2) whether Lebow should have credit for actual expenses incident to the oil production, as "innocent trespassers."

No evidence was heard by the circuit court on the questions. The gross receipts for oil were agreed upon; Lebow filed claim for expenses, to which Cameron filed exceptions, but the circuit court concluded that it was bound, as the "law of the case," to conclude that Lebow was not an "innocent trespasser" and consequently did not reach the question as to the propriety of the various expense items claimed by Lebow.

Thereupon the trial court entered judgment against Lebow (actually a judgment was entered against numerous holders of various shares in Lebow, some of which were below the jurisdictional amount for an appeal as a matter of right, hence the motion for appeal as to some). The judgment provided for interest at 6% from the date of entry of judgment; Cameron challenges this by cross-appeal, asserting interest should be awarded from the respective dates on which the oil was taken.

We have concluded that the trial court erred in holding that Lebow was a wilful trespasser. We also hold that the trial court correctly fixed the date from beginning interest computation as the date of judgment. We shall outline our reasons for these views.

First, it must be understood that Cameron v. Lebow, Ky., 366 S.W.2d 164, did *not* adjudicate the question whether Lebow was a wilful or innocent trespasser. That question was not in issue, in view of the nature of the judgment appealed from, until *after the question of abandonment had been* finally adjudicated. The decision did hold that Cameron's lease was legally effective and had not been abandoned. Thus, the trial court misconceived the opinion and incorrectly deemed that he was bound to conclude as "fact" that Lebow was a wilful trespasser. In view of that, we do not accord to the trial court's findings the usual weight prescribed by CR 52.01.

 The litigants agree that our law is well settled as to the definitive distinction between a wilful and innocent trespasser. A wilful trespasser *knows he is wrong;* an innocent trespasser *believes he is right.* Rudy v. Ellis, 314 Ky. 524, 236 S.W.2d 466, 468. Moreover, the litigants recognize that innocent trespassers are allowed credit for proper expenditures in extracting minerals from the lands of another, even though they may not have any of the profits. Rudy v. Ellis, 314 Ky. 524, 236 S.W.2d 466, 469.

Indeed, the litigants rely upon substantially the same authorities, but draw opposite conclusions from them as they are applied to the facts of the case at bar. The cases cited, in addition to the Rudy case, supra, are: Swiss Oil Corp. v. Hupp, 253 Ky. 552, 69 S.W.2d 1037; Hughett v. Caldwell County, 313 Ky. 85, 230 S.W.2d 92, 21 A.L.R.2d 373; Strunks Lane & Jellico Mountain Coal & Coke Co. v. Anderson, 297 Ky. 578, 180 S.W.2d 385; Loeb v. Conley, 160 Ky. 91, 169 S.W. 575. Other authorities are presented as touching upon collateral matters, but the principles ruling this controversy are enunciated in the Kentucky cases just listed.

 It would unduly extend this opinion to undertake a detailed analysis of each of these authorities, and it is not necessary. Perhaps the best single treatment of the subject is in Swiss Oil Corp. v. Hupp, 253 Ky. 552, 69 S.W.2d 1037, wherein it is recognized that the burden is always upon the offender to establish his status of "innocence." The *intent* of the trespasser is a key factor, but that is a subjective matter, generally, and the mere proclamation of an innocent intent will not suffice. The conditions and behavior are usually such as will enable the court to determine whether the trespass was wilful, or done "under a bona fide mistake, as where the circumstances were calculated to induce or justify the reasonably prudent man, acting with a proper sense of the rights of others, to go in and continue along the way." Some of the factors to be weighed are: "There should be at least reasonable doubt of the other party's exclusive or dominant right. The tres-

passer acted upon the advice of reputable counsel, to whom all the facts had been fairly submitted, upon questions of legal right concerning which a layman could hardly have knowledge, such as a disputed title, even though that advice proves bad."

■ Using these guidelines, we look to the "conditions and behavior" revealed in the record at hand. Lebow did not ruthlessly or recklessly move in on Cameron's rights. Lebow engaged counsel to examine the title, and learned of Cameron's color of title; the counsel informed Lebow that Cameron's claim was not "superior"; counsel directed certain curative steps, which were taken. Cameron learned from Lebow (through Hartsough) that Lebow was on the leasehold, and though Cameron then expressed the view that Cameron's lease remained valid, there was certainly no definitive action then by Cameron. In fact, nearly a year elapsed before Cameron filed this suit, during which time Lebow had drilled the second well (the first producing well). Cameron's own conviction of the justness of his claim suffered such misgivings as to lead him to decide to abandon it; the circuit court first ruled that Cameron's claim was invalid; this court reversed that judgment, but not by passing on the merits of the respective claims. When the merits were submitted to the circuit court that tribunal ruled that Lebow's claim prevailed over Cameron's. This court again reversed, by split decision of four to three. In face of all this, we think it is beyond question that Lebow acted "under a bona fide mistake * * * calculated to induce or justify the reasonably prudent man, acting with a proper sense of the rights of others, to go in and continue along the way." We think it may not be challenged that there was a "reasonable doubt" as to the validity of Cameron's claim, in face of the court decisions in this very lawsuit. We conclude, therefore, that Lebow was an innocent trespasser and should be required to account only for the net profit derived from the oil, rather than the gross profit.

The trial court has not adjudicated the propriety of the "expense" items asserted by Lebow; the record before us is inadequate to enable a decision of the factual and legal issues presented by the parties respecting the expense account. Thus it is necessary to remand the case for adjudication on the accounting.

■ Since we reverse the money judgments, the question as to the proper date for starting interest computation is no longer involved. However, we call attention to the identical situation as it was presented in Swiss Oil Corp. v. Hupp, 253 Ky. 552, 69 S.W.2d 1037, 1046. There this court approved the generally accepted premise that interest does not run on an unliquidated claim. Since there was no way to know (as there is yet no way to accurately know) what the ultimate judgments will equal, we are of the view that interest from the date of judgment will be proper.

The judgments are reversed on the original appeals in the consolidated cases; the judgment on the cross-appeal, for costs purposes, is treated as if affirmed on the cross-appeal.

MONTGOMERY and STEWART, JJ., dissenting.

MONTGOMERY, Judge (dissenting).

In the second appeal in this litigation, Cameron v. Lebow, Ky., 366 S.W.2d 164, the following quotation therefrom presented the question for review:

"In the present appeal the trial court had found that the lessees, Cameron, et al., appellants and plaintiffs below, had abandoned their 1939 lease, and that Lebow, et al., appellees and defendants below, holders of a later (1956) lease on the same property, had acquired their lease as bona fide purchasers. It is the appellants' contention that the trial court's finding of facts and conclusions of law are clearly erroneous."

In upholding the contentions of the appellants in that case, appellees here, the Court held that " * * * the appellants' lease is still good and that the evidence establishes that they did not abandon it." The Court further condemned the claimed good faith of the appellants here in the following language:

"While it is true that the appellees had the title to the lease examined and Mr. Richmond was prevailed upon to give the top or later lease to the appellees because he was assured that the appellants had abandoned their lease in legal effect, the stark facts still were there which would have caused the appellees to alter their course had they not wanted to do otherwise. First, Mr. Richmond told appellees' counsel of the appellants' lease, and, second, the lease was in the chain of title. With the ubiquitous Mr. H. B. Cameron always available, it would have been quite simple for the appellees or their counsel to ascertain whether the appellants still claimed an interest in the property. Instead, it seems to us, they studiously avoided doing so, the type of conduct condemned in Walter v. Ashland Oil & Refining Company (1945), 300 Ky. 43, 197 S.W.2d 425."

On the return of the case the trial court, with no further evidence presented, tried the case on the record and held that appellants were not innocent trespassers under authority of Loeb v. Conley, 160 Ky. 91, 169 S.W. 575, and further held that under the law of the case this Court had so determined.

I agree with the trial court and consequently disagree with the majority. Under the "law of the case" rule, parties may not re-litigate on a subsequent appeal matters affecting the subject of the litigation which could have been introduced in support of their contentions on a former appeal. Hutchings v. Louisville Trust Co., Ky., 276 S.W.2d 461. From the quotations taken from the opinion on the former appeal, the good faith of appellants was certainly considered by the trial court and this Court. In a similar case the Court held that where a contention was not made, if it could or should have been made on appeal, the doctrine of res judicata prevented re-litigation of the same contention in a subsequent appeal. E. F. Prichard Co. v. Heidelberg Brewing Co., 314 Ky. 100, 234 S.W.2d 486.

In my opinion for two reasons it is no answer to say that this Court did not decide the good faith issue: First, I think it did, and second, under the case last cited it was inherent in the appeal and, therefore, it could or should have been decided.

Further, I cannot agree with the concept of "innocent trespasser" or "bona fide purchaser" stated in the majority opinion. The early case of Loeb v. Conley, 160 Ky. 91, 169 S.W. 575, dealt with this problem fully. Cases covering analogous situations of one who improves the lands of another were considered. The rule there evolved is in substance that there can be no recovery for improvements made if they are made with actual notice of an adverse superior claim, and not in good faith, especially after the adverse claim had been asserted in a suit.

The rule was stated in Loeb v. Conley, thus:

"Whether a person acts in good faith, which involves an honest belief in the correctness of his position, depends on the circumstances surrounding the transaction. The mere personal belief of the person affected that he acted in good faith and honestly believed that he was right in the position assumed is not conclusive of the question, and will not of itself entitle him to the advantage of a person occupying a position of good faith. The court, in determining this question, will look into all the facts and circumstances surrounding the party, and decide from them whether he was acting

in good faith and under an honest conviction that he was right in his assumption."

In Swiss Oil Corp. v. Hupp, 253 Ky. 552, 69 S.W.2d 1037, Loeb v. Conley was approved, and it was further held that "The burden is always upon the offender to establish his status as an innocent or mistaken invader of another's property."

From the quotations in both cases the concept of an innocent trespasser is more that of the "innocent or mistaken" who inadvertently trespasses than it is that of good faith. In the instant case what appellants did was not innocently, mistakenly, or inadvertently done. Their conduct was deliberate, considered, and done without seeking to learn by inquiry the true facts from appellees. Under the guide so stated, I feel that appellants, as found by the trial court and as indicated in our former opinion, were not innocent trespassers.

For these reasons I respectfully dissent.

STEWART, J., concurs.