## Bennett Jellico Coal Company v. East Jellico Coal Company.

(Decided March 19, 1913.)

### Appeal from Knox Circuit Court.

1. Public Lands—Conflicting Patents.—A junior patent, in so far as it conflicts with an elder patent, is void, unless settlement has been made within the lap by the junior patentee, or those claiming under him.

2. Reformation of Instruments—Proceedings and Relief—Evidence Weight and Sufficiency.—To entitle one to reform a deed, on the ground of mistake, the evidence in support thereof must be clear, positive, and unequivocal. Evidence held not to support charge that a mistake was made in the execution of deed sought to have reformed.

3. Reformation of Instruments—Limitation of Actions—Period of Limitation—Mistake.—An action to reform a deed, on ground of mistake, is barred by limitation, although commenced within five years after discovery of the mistake, where such deed was executed more than ten years before the institution of the suit.

4. Deeds—Validity of—Mistake.—A grantee in a deed, who procures from his vendor a new deed for the purpose of correcting a mistake in the description of the land, acquires no rights thereunder, as against innocent purchasers and holders of such land.

5. Improvements—Compensation.—Where one makes improvements on the lands of another, without his consent, he will not, except under extraordinary circumstances, be permitted to remove, or be compensated, for such improvements. But, where, because of confusion in the boundary lines of adjoining lands, one through mistake made improvements on the lands of another, he may remove such of the improvements as can be removed without injury to the real estate.

6. Mines and Mining—Trespass—Actions—Damages—Measure of—Injuries to Mining Property.—In an action for trespass in removing and destroying coal, the measure of damages for the coal mined and destroyed is the usual and customary royalty paid in that locality for mining coal of like quality and in veins of approximately the same thickness.

S. B. DISHMAN, J. M. ROBSION, H. H. OWENS and DISHMAN, TINSLEY & DISHMAN for appellant.

BLACK, GOLDEN & BLACK for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Reversing.

The Bennett Jellico Coal Company sued the East Jellico Coal Company for damages, alleged to have been sustained by it on account of trespasses committed as follows: Alleging that it was the owner of a tract of land lying on the waters of Brush and Greasy creeks, in Knox County, Ky., and bounded as follows: Beginning at a large hickory tree near the top of the ridge between Brush and Greasy creeks, thence N. 34 E. 44 poles to an ash, thence S. 65 E. 20 poles to a sugar tree and linn, thence S. 10 E. 60 poles to four linns, thence S. 51 E. 24 poles to a linn and dogwood, thence S. 180 poles to a stake, thence to the beginning, it charged that the defendant had, in 1908 and since, wrongfully, wilfully, unlawfully, and without its consent, entered upon said land, made excavations, tunnels and entries into a valuable seam of coal thereon, known as the Dean seam, and removed large quantities of coal therefrom, that the amount of coal so removed was, at least, 25,000 tons, that said coal was reasonably worth $1.00 per ton at the time it was so taken, that, in addition, the said defendant, in removing said coal, had done so in such a negligent manner as to waste not less than 5,000 tons additional, and that the coal so wasted and lost to it was reasonably worth $1.00 per ton on board cars at said mine, and it prayed judgment against the defendant for the two sums, to-wit:

$25,000, the value of the coal actually taken, and $5,000, the value of the coal destroyed.

The defendant, for answer and counterclaim, admitted that it made the excavations, tunnels, and entries in the coal veins upon the land complained of, but denied that, in doing so, it had, in any wise, invaded or trespassed upon any rights of plaintiff. It denied that plaintiff was the owner of the land in question, and alleged that it was the owner of all of said land upon which and where the alleged trespasses were made. It denied that it had ever committed any trespass upon any land owned by plaintiff, or that it had damaged plaintiff in any sum whatever. Defendant further pleaded that it had purchased said land from its then claimant and owner and acquired title thereto, and that, following its said purchase, it had at great expense erected valuable improvements on said land in the shape of a mining plant, and had laid a railroad track from said mining plant at the mines on said property, so as to connect it with the railroad. That plaintiff knew of its possession of said land and of its putting thereon the extensive and costly improvements, so as to enable it to work said Dean seam coal vein thereon, which was and is very valuable, and that, notwithstanding this knowledge on the part of plaintiff, it made no objection and asserted no claim of ownership until said improvements had been made and said mining operations carried on to the extent complained of. It denied that the coal, so mined by it, was worth $1.00 per ton, or any sum in excess of one cent per ton in the mine, and it denied that it had conducted its mining operations in any other than a skilful and proper manner. It further pleaded that, some years before the institution of this litigation, one A. N. Smith was the owner and in possession of a tract of land adjoining the land in controversy, and known as the Marsee tract. That he sold said tract of land and attempted to convey same by deed, but that, by mistake in the draft of the deed, the Marsee tract was not described therein at all, but the land in controversy was described therein. That, at that time, and simultaneously with the execution of the deed, Smith put his vendee in possession of the land actually sold to him, which was the Marsee tract, and that the said vendee neither took nor claimed possession of the land in controversy, under his said deed. That, at the time of this conveyance, the said Smith held title to, and had posses-

sion of, both the Marsee tract and the land in controversy, and that, after his said sale of the Marsee tract, he remained the owner of the land in controversy. That Smith's vendee thereafter sold the land so purchased by him, and, in making the deed, copied the description in the deed so made to him by Smith, and in this way the mistake was again made; and so, through mesne conveyances from Smith's vendee down to plaintiff, each of the deeds made in the conveyance of the Marsee tract, by mistake, described the land in controversy, although the several owners of the Marsee tract were each possessed of it and none of them ever claimed the land in controversy. Defendant alleged that, while the deeds did not describe the Marsee land, each of the respective vendees knew the land he was buying and was possessed of, and, in each instance, it was the Marsee tract and not the land in controversy which he claimed, and defendants pleaded that all of these facts were known to the agents of plaintiff. That defendant did not and could not, in the exercise of reasonable diligence, discover the mistake in the deeds attempting to convey the Marsee land until within a few (less than five) years before the institution of this suit. That plaintiff did not discover until within one year before the institution of this suit the mistake in the description of the Marsee tract in the Smith deed, and plaintiff then procured Smith to make it a deed to the Marsee tract, and this act on the part of the plaintiff is pleaded and relied upon as establishing the fact that, at the time plaintiff persuaded Smith to make it a deed to the Marsee tract, it recognized that, in the original Smith deed, an error and mistake had been made. Defendant further alleged that the claim which plaintiff had been asserting to the land was casting a cloud upon its title to its damage and injury, and it asked that the case be transferred to equity and the rights of the litigants be determined, and that it be adjudged the owner of the land, plaintiff's petition dismissed, and its title quieted.

A motion to strike certain portions from the answer having been overruled, plaintiff replied. In addition to traversing the affirmative matter set up in the answer, pleaded that on March 27, 1871, the said A. N. Smith sold and conveyed the land, described in the petition, to Abijah Hoskins and Hoskins caused his deed to be recorded in the clerk's office of Knox County on November 23, 1872. That Hoskins sold said land to Davis Baker on

January 30, 1877, and his deed was recorded in the proper office on August 29, 1878, that Baker took possession under said deed and held thereunder until September 22, 1883, when he sold the land to Amos Powers, and Powers took and held under his deed until his death, in 189—, and that these are the deeds referred to by defendant in its answer. Plaintiff alleged that these deeds all conveyed and described the land set out and described in the petition; and plaintiff pleaded that the alleged claim of mistake, set up and asserted by defendant, occurred more than twenty-five years before the defense of mistake was interposed, and that said defense was barred by the statute of limitations. In its rejoinder, the defendant denied that, under the facts pleaded, its defense was barred. This pleading completed the issue, a great mass of testimony was taken by the respective parties, and, upon final submission, the chancellor found that the defendant was the owner of the land and accordingly adjudged. The plaintiff appeals.

The Lee Patent was issued by the Commonwealth to James Lee on November 25, 1852, and the description of the land covered by this patent is identical with the description set out in the deeds from Lee to Smith in 1865; from Smith to Hoskins in 1871; from Hoskins to Baker in 1877; and from Baker to Amos Powers in 1883. Powers died about 1903. In none of these deeds is any reference made to any patent, under which the land was acquired. Amos Powers left surviving him a widow and four children, and whatever land he owned passed to them under the laws of descent. Elizabeth Powers, widow of Amos, in February, 1905, sold, and by deed conveyed, to Samuel Bennett, Perry Lewallen and Kate Lewallen her entire interest in her husband's estate, as is evidenced by the following language found in her said deed: "Do hereby sell and convey * * * all of my life estate and interest in all of the real estate owned by Amos Powers at his death." Caleb Powers, a son of Amos, in December, 1904, conveyed to Samuel Bennett his one-fourth undivided interest in all the lands of his father, except his interest in the survey known as the Dean survey, containing some thirty acres, which, it is conceded, is no part of the land in controversy. In December, 1904, Rebecca Powers Greene and her husband conveyed to Samuel Bennett her undivided interest in the landed estate of her father. In May, 1904, John L. Pow-

ers, a son of Amos, conveyed to Perry Lewallen his undivided interest in the landed estate of his father and mother, Amos and Elizabeth Powers. So that, by these conveyances, Samuel Bennett became the owner of an undivided one-half interest in the lands of which said Amos Powers died seized and possessed, and Perry Lewallen and Kate, his wife, a daughter of Amos Powers, owned the remaining undivided one-half.

In August, 1908, Kate Lewallen and her husband, Perry, conveyed to G. P. Bain their undivided one-half interest in said lands and, in their deeds, among other lands, the James Lee survey, and referred to it as having been conveyed to Amos Powers by Davis Baker in 1883. In August, 1908, and as soon as Bain acquired a one-half interest in said land, he and Samuel Bennett conveyed to the Bennett Jellico Coal Company the Powers land, including the Lee survey, together with other lands. Thus, by a perfect chain of paper title, the Bennett Jellico Coal Company shows itself the owner of the James Lee survey.

The East Jellico Coal Company produced a deed from A. N. Smith to it, bearing date October 25, 1907, for the same property, and also claimed title thereto under and by virtue of the following deeds of conveyances to it, to-wit: One from S. D. Tinsley, April 11, 1902; and another from Milton Dean. Tinsley claims under a patent issued to him in 1886 on a survey made in 1885, and Dean claimed under a patent issued to him in July, 1895, on a survey made in April, 1895. The evidence shows that both the Tinsley and the Dean surveys overlap, in part, the Lee survey. As there is no evidence showing that any settlement was ever made by the junior patentees, or by any one claiming under them, within the lap or interference, the junior patents, in so far as they conflict with the Lee patent, are void. Morgan v. Morgan, 20 Rep., 190; Cornett v. Combs, 21 Rep., 837; Pace v. Asher, 137 Ky., 708; Ritchie v. Owsley, 143 Ky., 1; Sloan v. Hall, 145 Ky., 232.

So, appellee's right is made to depend upon two propositions: First, whether or not there was a mistake made in the execution of the deeds by Smith to Hoskins, Hoskins to Baker, and Baker to Powers; and if so, is appellee entitled to have said mistake rectified and said deeds, in so far as they describe the Lee patent, declared void and of no effect? Both propositions must be decided in

favor of appellee, or else its claim to ownership of this land fails.

On the question of mistake, the evidence is far from satisfactory. Smith says that the description of the land sold by him to Hoskins was taken from his patent; that he was entirely familiar with the exterior boundary lines of his patent, and, although he swears positively that he did not sell the land, described in the Lee patent, to Hoskins, he admits that he furnished the draftsman of his deed to Hoskins the deed describing the Lee land, and although Hoskins swears he did not intend to buy the Lee patent, he thought he was buying all the land that Smith owned. The fact that Hoskins took actual possession of the cleared portion of the land owned by Smith establishes nothing. The Lee land was not enclosed; had no buildings on it; was not suitable for tillage; and, being timber land, no one could take other than constructive possession of it. When the evidence of Smith and Hoskins is considered as a whole, it is reasonably apparent that Smith understood he was selling all of his land and Hoskins clearly understood that he was buying all the land that Smith owned. The statement of Smith that he did not sell the Lee patent is of no evidential value, when read in the light of his subsequent conduct. He was then preparing to leave this State, never to return. He sold some land to Hoskins, and Hoskins thought he was getting all Smith had. Smith moved to Missouri, stayed about a year, broke up, and returned to Kentucky. He needed money, and, although he lived for several years, immediately upon his return to Kentucky, upon a tract of land owned by Hoskins, he never claimed the land in controversy, or did or said anything that could, by even a strain of the wildest imagination, be construed into an assertion of title in, or ownership to, the Lee land; and, although he now says that he did not sell this land, his whole conduct shows that he did, and this effort on his part, after the lapse of thirty-six years, to defeat his deed made in 1871, has more the appearance of an effort to perpetrate a fraud upon appellant than to correct an honest mistake.

But, be that as it may—for the purposes of this case, it may be conceded that, as between Smith and Hoskins, a mistake was made, and that a similar mistake was made as between Hoskins and Golden and Golden and Baker—by this mistake, if mistake it was, the title to the

land in controversy was put in Baker, and he, in 1883, by his deed conveyed it to Powers. Powers put his deed to record and died in about 1903, without having parted with his title and without having disclaimed ownership of it. But, it is argued, that Powers did not claim it. There is some evidence that he did not, but there is some evidence that he did claim it and this latter is much stronger and more persuasive than the former. It is in evidence that, after he took the Baker deed, he conceived the idea that it did not embrace all the land he had bought of Baker and he caused, at least, some of his lines to be run by a surveyor, and then discovered that his deed did not include certain portions of the Marsee land. He immediately caused this land, not covered by his deed, to be patented to himself. And it is a most significant circumstance that, in his effort to possess himself of this land which he found his deed did not cover, the land he caused to be patented to himself calls for certain corners and lines of the Lee patent. He then knew that his deed from Baker called for these lines and corners, and the land he caused to be patented lay immediately adjacent thereto. He caused his deed to be put to record and exercised the only acts of ownership shown by the record to have been exercised by any one on the land, for he had cut, removed from, and sold certain walnut timber standing thereon. The evidence does not support the charge that Powers did not get, in his deed from Baker, the land which he understood he was buying. In other words, no mistake was made so far as he was concerned, or rather the decided weight of the evidence is against the contention that such a mistake was made, and, under the well established rule, in order to entitle one to relief on the ground of mistake, the evidence offered in support thereof must be clear, positive, and unequivocal. 17 Cyc., 775; Graves v. Mattingly, 6 Bush 361; Vaughn v. Digman, 19 Rep., 1340; Crabtree v. Sisk, 30 Rep., 572; Mahoning Coal Co. v. Dowling, 124 S. W., 370; Whitt v. Whitt, 145 Ky., 367.

But, if we felt less certain of our position upon this branch of the case and should concede, for the purposes of argument, that as to Powers also a mistake was made in the execution of the deed by Baker to him, appellee's position would not be strengthened, for, as a stream can rise no higher than its source, so appellee can acquire no greater rights than its vendor, Smith, had. If Smith

could not have had the deed corrected, appellee cannot, and so we pass to a consideration of the second question raised, to-wit: Is appellee barred by the lapse of time from having the mistake, if such there was, corrected?

Section 2519, Kentucky Statutes, provides:

"In actions for relief for fraud or mistake, or damages for either, the cause of action shall not be deemed to have accrued until the discovery of the fraud or mistake; but no such action shall be brought in ten years after the time of making the contract or the perpetration of the fraud."

This is a statute of repose, provided for the very purpose of meeting cases of this character. It recognizes the fallibility of man; that, in the ordinary every day affairs of life, mistakes will often be made and that due administration of justice requires that they should be corrected, and it fixes the time limit within which one, seeking relief of this kind, must apply therefor.

This maximum limit is fixed at ten years, and the right being statutory, in order for one to avail himself of its benefits he must bring himself clearly within its provisions. Does appellee do so? In 1871, Smith was in possession of the Lee patent. He sold it, and, by his deed, passed that possession to Hoskins, and from that day on he had neither actual nor constructive possession of this land; Hoskins' deed was put to record; Hoskins did not disclaim ownership; Smith was not claiming it; for thirty-six years he is silent. Now, suppose the title was still in Hoskins and Smith should bring his suit against Hoskins to have the deed reformed, could he do so? Certainly not. But, it is argued that Hoskins consents that it shall be done—being under no disability, he might do so. But, in that event, Smith would recover the land, not by virtue of any legal right, but by grace of Hoskins. His consent here can be of no avail, for he has parted with his title, and those who bought and hold under him can create in Smith no greater right than Hoskins could, after they, in turn, have parted with the title; but, in order to make the consent available, it must be the consent of the last claimant, who is an innocent holder. In this case appellant stands in this attitude, for its immediate vendors, Bennett and Bain, bought it before Smith attempted to convey to appellee. Their deeds were of record. They claimed under them. They not

only do not agree with appellee that a mistake was made, but testify positively that they got only what they bargained for, and, in this, they are supported by their deeds. Appellant acquired this title and, as it refuses to consent to the correction of the old Smith deed of 1871, the parties are relegated to their rights under the statute. This statute, as stated, gave them, at most, but ten years' time within which to institute proceedings to have the mistake corrected, and having failed to exercise that right within that time, their right to the remedy has been lost to them. Salve v. Ewing, 1 Duval, 271; Abner v. Gabbard, 17 Rep., 410; German Security Bank v. Columbia Finance & Trust Co., 27 Rep., 591; Blakley v. Hanberry, 137 Ky., 283.

It is argued that, under the authority of Morgan v. Combs, 32 Rep., 1205, and Sewell v. Nelson, 113 Ky., 171, the application of this rule cannot be invoked in a case like this. We do not so construe those opinions. In Morgan v. Combs, the relief was sought before the ten years had run, and the party seeking the relief, having brought himself within the sheltering protection of the statute, was granted the relief asked, and it is clearly intimated in that opinion that, were it not so, a different rule would have been applied as appears from the following excerpt therefrom:

"If wrong in the conclusion that the deed was procured by fraud, we would nevertheless think it right to correct the deed, for it is manifest from the evidence that it conveys other land and more than double the quantity sold by appellants, Charles and Sarah Morgan, to W. J. Combs. So, treating the transaction as a mistake, appellants would still be entitled to a reformation of the deed. * * * *

"The statute of limitation does not, as contended by appellees, bar appellants' right to the relief demanded. The discovery of the fraud, or mistake in the procurement of the deed, was made within ten years of the date of its execution, and the action brought within the ten years and within five years' time of the discovery of the fraud or mistake, and the evidence shows that the discovery could not have been sooner made."

In Sewell v. Nelson, the facts are wholly unlike those here presented. There, Nelson brought suit to quiet his title to certain lands, of which he was and had been in possession for some years. Sewell asserted title to the

same land under an old deed. Nelson sought to avoid the effect of this deed by showing that it was fraudulent and voluntary. Sewell pleaded that the deed had been made in 1884, and that, as more than ten years had elapsed from the time of its execution before the filing of the suit, the statute of limitations against relief, when based upon fraud or mistake, operated to perfect his title. In considering this contention, the court said:

"The argument is a novel one. It is that one out of possession, claiming a right of possession under a fraudulent and void conveyance it may be, can have such conveyance ripened by time into a perfect one; that it may sustain an action of ejectment against one originally having the better title and in possession. The position is fallacious. The statutes of limitations do not apply (as respects property) to any one not in possession. The plea is a defense toward maintaining the status quo. A mere claim, for whatever time, unaccompanied by actual possession, can give no right under the statute."

We have no such state of case here. Smith, after the execution of the deed in 1871, was never in the actual possession of the land covered by the Lee patent, and, having by his deed passed to his grantee his constructive possession thereof, his case falls clearly within that class of cases of which the statute treats.

The case of Dean v. Hall, 31 Rep., 1306, cited and relied upon by appellee, is not in point, for the reason that there suit for reformation was begun within less than five years from the time the deed was made. The language quoted and relied upon is simply a statement that the aggrieved party is entitled to prosecute a suit of that character. No question of limitation was involved.

Appellee is not the owner of this land, and is answerable to appellant for such damages as it sustained by reason of the trespasses complained of. In order to arrive at the proper estimate of the damage, it is necessary to locate, with accuracy, the exterior boundary lines of the Lee patent. Much evidence was introduced on this point. While that introduced by neither party is entirely satisfactory, the weight of the evidence supports the claim of appellant as to the proper location of the corners and exterior lines of said patent. The patent calls for a large hickory tree on top of a ridge as the beginning corner. Appellee's evidence tends to show that this tree is still standing, although the tree designated by its witnesses

as the beginning corner, is not a large hickory tree and has no marks of an age indicating that it is the tree referred to in the Lee patent. The evidence for appellant is to the effect that this tree is down and the place where it stood is evidenced or marked by an indenture or hole in the ground, and, as evidence that this hole is the place where the tree stood, it is shown that the roots of a hickory tree were found in the ground at that point, and a marked chestnut stands near. This evidence, of itself, is not much more satisfactory than is the evidence introduced by appellee upon this point, but we find that, in running the lines of the Lee patent from this hole in the ground several marked trees are passed, and while the marks on some of these trees are not of sufficient age to lead to the belief that they were marked when the Lee patent was surveyed, they are of sufficient age to lead to the belief that they were marked when the survey for the Powers patent was made. As this was run with the Lee patent, it is apparent that, in running the Powers survey by the Lee lines, the hole in the ground must have been accepted as the beginning corner. When the Powers survey was run, the hickory tree was evidently standing, and it undoubtedly stood where appellant claims it did. Accepting the hole in the ground near a marked chestnut tree as the first corner, a sugar tree and dogwood as the third corner, the four linns as the fourth corner, and a linn and sugar tree as a fifth corner, we have only the second and sixth corners unmarked. These are easily fixed by reversing the calls from the adjoining corners and extending the lines until they meet. The figure described on the map marked "Exhibit T. W. No. 1" by the dark red lines is near the true location of the exterior boundary of the Lee patent and will be treated as such. •The argument that this survey is not correct, because some of the lines had to be extended in order to make them close, is without merit, for it is well known that these old surveys were frequently not made with accuracy, and in locating their boundary marked corners exercise a controlling influence over both course and distance.

Some confusion has arisen in the record, owing to the fact that appellee pleaded that it put up costly improvements in the way of mining machinery, etc., upon this property. From a careful reading of the record we are convinced that no improvements whatever were put upon

the land covered by the Lee patent by appellee; it simply ran its tunnels under this land from land owned by it and, in order to remove the coal, put in such props and laid such tracks in the tunnels made under the Lee land as were necessary to enable it to remove the coal. As it has ceased taking coal therefrom, it is more than likely that the tracks, at least, have been removed; but, whether they have been or not, it is evident that the value of the improvements put in this mine by appellee, upon the land in question, is inconsequential. Whether valuable or not, if appellee, at the time the tracks were being so laid and the mine so propped, had actual notice of appellant's ownership, it is in no position to complain, for it is well settled, by a long line of decisions, that where one, without the consent of the owner, makes improvements upon another's property, he does so at his peril, and, except under extraordinary circumstances, will be allowed neither to remove the improvements so made nor to receive compensation therefor. Smith v. Bell, 91 Ky., 655; Henry v. Brown, 99 Ky., 13; Wade v. Keown, 25 Rep., 1787; Montgomery County v. Bean, 26 Rep., 568.

As there has existed an honest doubt as to the true location of the exterior boundary lines of the Lee patent, we conclude that, under the circumstances of this case, if appellee can remove the tracks so laid in the mines, without injury to the mine, it should be permitted to do so, but, as it would undoubtedly injure appellant's property to remove any props that it may have put in the mine, appellee must permit these to remain and is not entitled to recover anything on account of the props, or any other property that it cannot remove from the mine without injury to it.

The evidence as to the amount of coal removed from this land by appellee and as to its value is so unsatisfactory that no judgment could be directed thereon that would do justice to the parties, and particularly to appellee. As the case must be reversed, it should, upon its return, be referred to the master to hear proof and report the facts, upon which the rights of the parties can be determined. Appellant claims that it is entitled to the value of the coal so taken by appellee, on board cars at its mines, and fixes this value at $1.00 per ton, and also to the value of the coal alleged to have been destroyed by the negligent manner in which the mining was done; while

appellee claims, if liable at all, it is only for a few cents per ton for the coal actually taken. The real damage, in a case like this, is the value of a reasonable royalty for the coal taken and destroyed. Sandy River Cannel Coal Co. v. White House Cannel Coal Co., 125 Ky., 278.

In determining what is a reasonable royalty, the courts should take into account the royalties paid in that locality for coals of like quality in veins of approximately the same thickness. In order, therefore, for the chancellor to determine the sum which appellee should pay, the commissioner should be directed to hear proof as to the acreage from which the coal was mined and the manner in which the mining operations were conducted, the thickness of the seam from which the coal was taken, and the quality of the coal, and also as to whether or not the mining was conducted in a manner so as to avoid unnecessary waste of the coal. The commissioner should also hear proof and report as to the actual number of tons of coal removed from this land by appellee, and also as to the number of tons which, considering the acreage of the mine and the thickness of the seam, could have been taken from this land, if it had been properly mined. If it should appear that the coal so removed was, in amount, approximately that which, under proper mining conditions, the territory affected should have produced, then nothing should be allowed on account of improper management in the removal of the coal from the mines. On the other hand, if the amount of coal shown to have been removed from this land is materially less than what, the evidence shows, should have been produced from the given territory, the court may, in addition to the value of the actual amount of coal removed, award appellant compensation for such as could have been, by pursuing proper mining methods, removed from the mines, but which, because of improper mining methods, was destroyed. The amount of coal, when arrived at in this way, at the usual and customary royalty for similar coals in that locality, fixes the sum for which appellant should be given judgment.

Now, that the title to the land in controversy is settled and the exterior boundary lines thereof fixed, and the measure of damages given, it is altogether probable that the parties can agree among themselves and save the expense of a reference of this case to the master. The court should give them a reasonable opportunity to do

so upon the return of the case, but, in the event of their failure to do this, it should have the proof taken, and, upon the finding of the master and the evidence reported by him, enter a judgment in favor of appellant for the damage, in this way shown to have been sustained.

Judgment reversed and cause remanded for further proceedings consistent with this opinion.