## Swiss Oil Corporation et al. v. Hupp et al.

(Decided March 23, 1934.)

.554

E. L. McDONALD and D. L. HAZELRIGG for appellants.

S. S. WILLIS and E. C. O'REAR for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Reversing.

In Swiss Oil Corporation v. Hupp, 232 Ky. 274, 22 S. W. (2d) 1029, it was decided that the oil and gas lease made in 1916 by W. L. Gillem to one Albin, coming by conveyance to the Union Gas & Oil Company, thence to the Swiss Oil Corporation, should prevail over a top lease to Hupp and associates made in 1921. The case was remanded for an accounting or the adjudication of damages arising from the trespass and extraction of oil by the appellees. During the period of operation Hupp and associates recovered and sold 67,527 barrels of oil for $142,849.28. The trial court adjudged this sum to the Swiss Oil Corporation and the Union Gas & Oil Company, less the cost of production, fixed at $60,148.88, thereby awarding a judgment for $82,700.40, with interest from the date of its entry. All parties appeal from that judgment. The Swiss Oil Corporation and the Union Gas & Oil Company take the position that they are entitled to the gross receipts of

position that they are entitled to the gross receipts of $142,849.28, with interest from the dates the various collections were made, which would be about $70,000 up to this time. Hupp and associates are contending that the proper criterion of damages is the usual and customary royalty of one-eighth of the value of the oil produced, or that they have the right to satisfy their obligation by restoring 67,527 barrels of oil which they have offered and are prepared to deliver within a reasonable time. They likewise claim the right to a credit for the enhancement in value of the property by reason of the permanent improvements. Other issues with respect to the correctness of the amounts of the charges and credits under the measure of damages fixed by the court will appear in the course of the opinion. For brevity the Swiss Oil Corporation and the Union Gas & Oil Company, which preceded it, will be referred to as the oil company, or as appellants, and Hupp and those associated with him will be referred to as Hupp or as the appellees, for there is a unity of interest among the parties on the two sides of the case, respectively.

1. The prime problem is to determine the quality of the appellees' acts in entering upon the property and extracting the oil. That they were trespassers is no longer in doubt. Their classification as willful or as innocent trespassers, as commonly called, is the hinge upon which the case hangs and upon which the decision as to the extent of recovery must turn. In the approach to the consideration of the evidence, we may suggest the abstract distinction between a willful and an innocent trespasser met with in the opinions dealing with this character of cases, namely, the one knows he is wrong and the other believes he is right. The degree of culpability as between the two determines the extent of liability. The former class of wrongdoers find the way of the transgressor hard under the law. They are held to a strict accountability for their malappropriation of another's property. Complete restitution without credit for expenses incurred or deduction of costs of production is required. But those who invade the property of another inadvertently or under a bona fide belief or claim of right and extract minerals are allowed credit for proper expenditures in obtaining or producing them. While not allowed any profit, they are not to be penalized. See Bozeman Mortuary Association v. Fairchild, 253 Ky. 74.

In February, 1916, W. L. Gillem executed an oil and gas lease on his 50-acre tract in consideration of $1 and the promise to pay 10 cents an acre per year for 10 years, unless developed. The Union Gas & Oil Company at that time acquired leases on about 17,000 acres, which comprised nearly all the farms in the district. About 1917 or 1918 it discovered that this was a productive field. The company claims that it was drilling and developing its various leases as rapidly as possible, but that Hupp came into the field and made some of the lessors dissatisfied. On the other hand, Gillem has claimed that the company was neglectful of him and was refusing to drill upon his land, being satisfied to pay the $5 annual rental. At any rate, in February, 1920, Gillem served notice upon the company to develop his property promptly, and, unless that was done, he would bring suit for cancellation of the lease. The company proclaimed, according to Gillem, that those who had given notice would be the last to have their property drilled.

In May, 1921, or 15 months after the demand had been made, Hupp was informed by Gillem of the situation. He also learned then that the oil company was contending it did not have to drill as long as it paid the rentals and that it had the right to the position it was taking under that lease. In that month the oil company began a well about a quarter of a mile from Gillem, which was the closest point it had commenced to develop. It already had a number of producing wells a little farther away. At this time Gillem agreed to lease his land to Hupp, declaring that he would treat the oil company's lease as abrogated. Hupp and Gillem were advised by a firm of reputable local lawyers that in their opinion the oil company's lease had been forfeited, and that Gillem had the legal right to disregard it and to execute an exclusive lease to another. About the same time Hupp submitted to a distinguished attorney in Frankfort, a former member of this court, copies of the oil company's lease and the notice which had been given it to develop, together with a statement of the foregoing facts. After an investigation of the authorities, this attorney gave an opinion that the former lease had been forfeited and that Gillem was free to execute a lease to Hupp. Thereupon, acting upon the facts and the legal advice thus obtained, Gillem executed a lease to Hupp on May 18, 1921, for which he was paid $1,350

as part consideration. A separate contract was also signed with the respect to payment of further consideration upon a judicial determination as to the validity of the respective leases. This contract will be referred to later.

A few days thereafter Gillem brought suit in the United States District Court against the oil company to have its lease adjudged to be forfeited. Two months after the Hupp lease had been given and this suit was filed, the oil company, over Gillem's protest, moved a rig on the premises and began drilling. A well was brought in, and by December, 1921, the company had a second well. No others were ever drilled by it. The suit in the federal court was not pressed and was dismissed without prejudice on May 3, 1922. A few days later suit was brought in the state court by Gillem against the oil company's employees to enjoin them from trespassing upon his land. But no temporary restraining order was applied for. About the time that suit was filed Hupp went upon the land and also began operations. It is stipulated that Hupp would testify he believed that he had the right to develop this property, and that he proceeded to do so in reliance upon the advice of counsel, and that he continued his development on account of the delays encountered in the courts and because of the progress of the development in that field. The trial court enjoined the oil company's employees, and held that its lease was void. A few months later that judgment was modified by striking all reference to the oil company, since it was not a party to the suit, and the case was dismissed by agreement. After a time, the case was brought to this court by Gillem, but the appeal was dismissed on November 13, 1925, on the ground that the agreement had put an end to the litigation. Shannon v. Gillem, 211 Ky. 217, 277 S. W. 244.

Within a short while after the filing of that suit, this action was begun on June 13, 1922, by the oil company against Gillem and others, seeking the cancellation of the Hupp lease and asking that its title be quieted. No temporary injunction was sought. The defendants pleaded the invalidity and abandonment of the oil company's lease and set up the lease to Hupp, and asked that it be adjudged to prevail. The trial court (with a different judge from that which decided the suit against the employees) held in this case also that the senior lease had been forfeited and that Hupp's junior lease

was good. An appeal was prosecuted, but the judgment was not superseded. That judgment was reversed in Union Gas & Oil Company v. Gillem, 212 Ky. 293, 279 S. W. 626, because Moore and Swope, who had acquired interests in the oil rights from Gillem, were necessary parties and had not been brought before the court. But it was declared in the opinion that the oil company had not begun development within a reasonable time after the notice given it by Gillem, and that, had he remained as the sole lessor and not sold his interest to Moore and Swope, "it cannot be doubted that he would have been entitled to declare a forfeiture." Two other cases were referred to involving the same issues between the oil company and W. L. Gillem's brother, George Gillem, and another lessor, in which the same conclusion had been reached by both the trial and this court that the bottom leases had been abandoned. One is Union Gas & Oil Company v. Indian-Tex Petroleum Company, 199 Ky. 384, 251 S. W. 1008; the other of the same style, in 203 Ky. 521, 263 S. W. 1. Other cases involving similar leases in this territory are Union Gas & Oil Company v. Wright, 200 Ky. 791, 255 S. W. 697, and Union Gas & Oil Company v. Indian-Tex Petroleum Company, 202 Ky. 236, 259 S. W. 57.

Up to the time of the first reversal of the judgment (November 13, 1925), the parties had regarded the sale by Gillem to Moore, and his sale in turn of a part of his interest to Swope, as being only royalty interests, and those two men had been accepting their fractional shares of the royalty. Meanwhile, in December, 1921, Hupp had procured the signatures of Moore and Swope to the top leases, and they had undertaken to ratify Gillem's lease to Hupp. It also appears that during the interim the conveyance of Gillem to Moore had been reformed by the court so as to pass only an interest in the royalty. It was developed upon the return of the case that Moore and Swope before all this had been secretly dickering with the oil company, and by their acts had induced that company to proceed with the drilling of the leases. The trial court again adjudged that the bottom lease had been forfeited and that Hupp's top lease was superior. But this court again reversed the judgment and held that the activities of Moore and Swope as cotenants of Gillem were such as to bind all of them and had the effect of avoiding the notice to develop which Gillem had given the oil company prior to the time he sold the

interests to Moore. It was consequently held that Hupp's lease was invalid. Swiss Oil Corporation v. Hupp, 232 Ky. 274, 22 S. W. (2d) 1029.

Although the petition óf the oil company is in the former record, the stipulation filed in the present record for the purpose of the accounting recites that the oil company in its petition had alleged that Gillem had sold only an undivided interest in the royalty reserved in his original lease to the oil company, and that it had paid that part of the royalty to Moore and Swope. It is further stipulated that the status then was that the oil company was claiming all of its rights under its lease and by reason of its terms as well as by the estoppel of the defendants, as set out in the petition. Further, that Hupp and his associates, agents, and attorneys had no notice or knowledge that Moore or Swope had had any communication with the Union Gas & Oil Company or any of its representatives respecting developments of the lease or otherwise, and that they were ignorant at all times of the fact that Moore and Swope, or either of them, had done anything to induce that company to proceed to drill under its lease. It was under that state of facts, it is agreed, that Hupp continued to drill and develop the property, having commenced the drilling previous to the filing of the petition. The operations begun in June, 1922, appear to have been continued until some time in 1926.

Supplementing the facts thus stipulated is Hupp's evidence. He testified that he first became interested in the Gillem property in May, 1921, when he acquired the lease involved in this suit and one from John C. Gillem. The Union Gas & Oil Company had gone on the property; that it was a foreign corporation and he knew nothing about its financial condition; that they were taking oil from under the John Gillem property and an offset well was due on this lease; that he had been advised by his attorneys of his rights; that wells were being operated nearby. The price of oil was good at the time. He intended at first to drill only one well, but development was going on all around the lease, and, since oil was being taken from under the land, he was led to go on with further development. After the court had decided in January, 1923, that the company's lease on the George Gillem land was void (see 199 Ky. 384, 251 S. W. 1008, 1009), and he had received advice from his attorney, Judge Edward C. O'Rear, he concluded

that he should go on and drill offsets, since wells were being put down on adjoining farms. Before that decision by this court, he had drilled only one well on the W. L. Gillem lease. Afterward he drilled six more wells. There is no testimony to the contrary.

Of what quality and in which class of trespassers do these facts place the appellees? The burden is always upon the offender to establish his status as an innocent or mistaken invader of another's property. To be sure, the mere testimony of the person affected that he acted in good faith and honestly believed he was right in the position he assumed is not conclusive or, indeed, sufficient of itself to entitle him to the advantage of one occupying the place of innocence or good faith. The test to be applied is that of intent, but, being a state of mind, it can seldom be proved by direct evidence. The conditions and behavior are usually such that the court can determine whether the trespass was perpetrated in a spirit of wrongdoing, with a knowledge that it was wrong, or whether it was done under a bona fide mistake, as where the circumstances were calculated to induce or justify the reasonably prudent man, acting with a proper sense of the rights of others, to go in and to continue along the way. And, in judging the trespasser's acts, regard must be had for conditions as they then appeared rather than as disclosed in the light cast backwards by the future. In a word, they are to be judged prospectively, not retrospectively. So, as stated in Loeb v. Conley, 160 Ky. 91, 169 S. W. 575, Ann. Cas. 1916B, 49, whether a trespasser is to be so regarded depends upon the circumstances surrounding the transaction, and it is from those facts and circumstances that the court will determine whether he was acting in good faith and under an honest conviction that he was right in his assumption.

Among the factors to be considered as evidencing good faith are these: There should be at least reasonable doubt of the other party's exclusive or dominant right. The trespasser acted upon the advice of reputable counsel, to whom all the facts had been fairly submitted, upon questions of legal right concerning which a layman could hardly have knowledge, such as a disputed title, even though that advice proves to be bad. Of stronger influence, manifestly, is the fact that a court of competent jurisdiction has rendered a favorable judgment upon identical or similar issues. The test is not

the trespasser's violation of the law in the light of the maxim that every man knows the law, but is his sincerity and his actual intention at the time. Therein is to be found his justification. A phase entering into the situation may be the character of the property as it pertains to the question of whether delay would endanger loss and action would seem to be urgent. Thus a difference is recognized where the land produces mineral ores or timber and where it produces oil and gas because of the fugacious nature of the latter. These statements find support in many authorities, of which these only need be cited for they refer to numerous others: Kentucky Harlan Coal Company v. Harlan Gas Coal Company, 245 Ky. 234, 53 S. W. (2d) 538; Barnes v. Winona Oil Co., 83 Okl. 253, 200 P. 985, 23 A. L. R. 189; United States v. Homestake Mining Co., 117 F. 481, 54 C. C. A. 303; Backer v. Penn Lubricating Co. (C. C. A.) 162 F. 627; Campbell v. Smith, 180 Ind. 159, 101 N. E. 89 (a well-considered opinion applicable to several phases of the case at bar); Pan Coal Co. v. Garland Pocahontas Coal Co., 97 W. Va. 368, 125 S. E. 226; Willis' Thornton on Oil & Gas, sec. 59.

With this yardstick in hand, we look back and summarize the evidence and reasonable inferences. It was fifteen months after Gillem had demanded development of his property by the oil company without results when negotiations were begun with Hupp. Before taking the top lease, Hupp was assured, not by one but by two or three learned attorneys, that the former lease had been forfeited. When he took the lease, the oil company immediately entered upon the premises over protest. Suit was filed by the landowner in the federal court, but he did not press it. When it appeared that the oil to which he had the right, according to legal advice, was being drained, and a year after he had obtained the lease, Hupp drilled one well as an offset. An injunction suit was filed against him at that time by the oil company, but no temporary restraining order was sought, which he may have felt was indicative of a lack of assurance by the oil company of the strength of its claim. Nothing further was done by Hupp until this court of last resort had held that under an exactly similar situation (as he and doubtless all concerned believed) the oil company's lease was invalid and the top lease was good. This was followed in a short time by two similar opinions relating to the lease of property of another brother

and a neighbor. Then soon afterward there was a judgment of the circuit court holding this identical bottom lease to be of no effect. Hupp was thus fortified by these final judgments during the course of his drilling the six additional wells and the operation of all of them. All the while his contestant was operating two wells on the same property and others adjoining. In time the trial court in his own case quieted his title and adjudged him the right to do all that he had done and was doing. As it was not superseded, he had the full right to proceed under it without an imputation of bad faith. See Rowe v. Arnett, 241 Ky. 768, 45 S. W. (2d) 12. That judgment was not reversed on the merits but because of defect of parties.

The one and only thing that caused Hupp to lose and the other side to prevail ultimately, as it is conceded, was entirely unknown to him and his representatives. Those upon whom he had been relying had deceived him. And it is not amiss to say we are not forgetful of the doubt and the difficulties encountered by this court in reaching the final conclusion as to which lease should prevail. Moreover, Hupp had paid a substantial consideration for the right to drill, and, pending the final determination of the litigation, expended perhaps $70,000 in the project. This indicated either a definite assurance of the integrity of his claims or a most reckless gamble on the result of a willful wrongdoing. The price of oil was high and that within his lease was being depleted by a company whose financial standing was unknown to him. The perishing quality of the property put in jeopardy seemed to demand that a prudent man should not delay. From a consideration of all these facts and others of more or less probative value, the court reaches the conclusion that the chancellor's judgment that the appellees were innocent trespassers is right.

We have given full consideration to the authorities cited by the appellants, but think they are distinguishable on the facts. The strongest case in support of their contention that the appellees are willful trespassers is Pittsburgh & West Virginia Gas Co. v. Pentress Gas Co., 84 W. Va. 449, 100 S. E. 296, 7 A. L. R. 901. But that opinion in its broad application was modified in Pan Coal Co. v. Garland Pocahontas Coal Co., supra, where a number of analogous cases from over the coun-

try are brought together and considered in reaching a different conclusion upon similar facts.

Emphasis is laid by the appellants upon a collateral agreement executed simultaneously with the Hupp lease; it being urged that this proved Hupp guilty of bad faith, and his lease to be champertous. That document recites the execution of the lease which it is said should be governed by the contract. The substance of that contract is that, whereas there was a prior lease claimed by the Union Gas & Oil Company, it was agreed that, if Gillem should succeed in having it judicially determined to be void by a suit to be instituted by him for that purpose, or if it should be surrendered by the lessee, then Hupp would pay $5,000 as additional consideration to the $1,350 already paid for the lease. Hupp further bound himself unqualifiedly to begin a well within three months after such adjudication or surrender, and, if oil should be found in paying quantities, to continue drilling until the property was exhausted. We do not attach the significance to this writing that the appellants do. Its effect was to promise further consideration and insure absolutely immediate and full development whenever Gillem should clear the title. Gillem was in possession of the property, and had more than a year before given such notice as had the effect of vacating the prior lease but for certain intervening activities of others. The new lessee was cautious enough on this account to wait a year before beginning development, and then he did so only when the former lessee was draining the lease.

2. The fact that the trespass was in good faith and reasonably justifiable does not affect the right but merely the amount of recovery by the one against whom it was committed. The real difficulty we have met in this case has been to determine the measure of recovery in view of the adoption by this court of the royalty basis where coal is taken under the same circumstances, and in one case where the extraction of oil and another of gas was involved. The general interpretation put upon our opinions by text-writers and other courts has been that in a case of this character the usual and customary royalty will be regarded as the basis of recovery. We think this is due to a failure to recognize the distinction lying back of the decisions, which is that in some of the other jurisdictions no difference is made between the

owner and a mere lessee of mineral rights, or rather between an ordinary coal lease and an oil and gas lease.

What is usually termed a coal lease is in fact, under our decisions, the conveyance of absolute title to the minerals under the surface, thereby creating by a severance two distinct estates, so that the holder of the coal lease is the same as the owner of the land. Kennedy v. Hicks, 180 Ky. 562, 203 S. W. 318; Wakenva Coal Co. v. Johnson, 234 Ky. 558, 28 S.W.(2d) 737; Trimble v. Kentucky River Coal Corp., 235 Ky. 301, 31 S. W. (2d) 367. Such a conveyance is different in its nature from an oil and gas lease, although we hold that such is an interest in land requiring that it should be granted in writing under the statute of frauds (Ky. Stats., sec. 470). Kentucky Counties Oil Co. v. Cupler, 204 Ky. 799, 265 S. W. 334, and cases therein cited. But the right of such lessee is limited to exploring and producing, and he does not acquire any title to the oil until it has been taken from the ground. Louisville Gas Co. v. Kentucky Heating Co., 117 Ky. 71, 77 S. W. 368, 25 Ky. Law Rep. 1221, 70 L. R. A. 558, 111 Am. St. Rep. 225, 4 Ann. Cas. 355; Gray-Mellon Oil Co. v. Fairchild, 219 Ky. 143, 292 S. W. 743; Williamson v. Williamson, 223 Ky. 589, 4 S. W. (2d) 392; Union Gas & Oil Co. v. Wiedeman Oil Co., 211 Ky. 361, 277 S. W. 323; 40 C. J. 978; Willis' Thornton on Oil & Gas, secs. 43, 45 and 60. We therefore perceive a difference between what is denominated a coal lease, or the lease of fixed or solid minerals, and an oil and gas lease. It is generally said that the measure of damages for conversion of minerals is the same "whether the right arises out of the ownership of the land or of the mineral estate under a grant or reservation or the right to produce under a prior lease." Mills and Willingham, Law of Oil and Gas, sec. 20. Again we think that such a statement is not applicable where a material distinction is drawn between the character of the conveyances.

The measure of damage in respect of oil leases where the trespass or appropriation was in good faith is by weight of authority declared to be the value of the oil at the mouth of the well, less the amount reasonably expended in producing it. Willis' Thornton on Oil and Gas, sec. 59; Mills and Willingham, sec. 22; 40 C. J. 918; annotations, 7 A. L. R. 908; Barnes v. Winona Oil Co., supra; and annotations, 23 A. L. R. 193. There are many cases supporting that rule. But those and other

authorities usually point out as exceptions to that general rule of admeasurement that in Pennsylvania and Kentucky the criterion of damage or compensation is the customary royalty paid in the community; and numerous opinions of this court are cited, all of which involved coal, except one case involving oil and another involving gas, to which we shall presently refer. There are cases in other jurisdictions also cited as following the royalty rule in oil cases, but we are particularly concerned at this time with our own.

The recent opinion of Kentucky Harlan Coal Company v. Harlan Gas Co., supra, brings together our cases holding that, where there has been an innocent invasion of coal .property of another the offending trespasser or lessee is liable only for royalty upon the coal removed, whether it be due to the owner of the entire estate or the owner or lessee of the mineral estate. We have no disposition to depart from that rule. We regard it sound, for royalty is all that such an owner would have received for what he had under the usual and customary lease or conveyance. For the same reasons such compensation ought to be allowed the owner of land where one without legal right but in good faith has extracted the oil or gas under or within his property. But there is a material difference where the contest between two oil and gas lessees. Such a lessee is entilted to, and becomes the owner of, seven-eighths of the oil and not one-eighth, as is the landowner under the usual contractual relation.

In Gerkins v. Kentucky Salt Co., 36 S. W. 1, 24 Ky. Law Rep. 34 (sometimes found in the citations), the owner of a life estate and of a one-sixth in remainder leased the land, and gas wells were brought in. In that opinion it was written that the other remaindermen could not enjoin the taking of the gas by the lessee, but it was suggested that they might be entitled to recover their part of the royalties from the life tenant. On a reconsideration, that opinion was withdrawn and another under the same style reported in 100 Ky. 734, 39 S. W. 444, 19 Ky. Law Rep. 130, 66 Am. St. Rep. 370. It was held that the remaindermen were entitled to royalty from the lessee, and that, if it were not paid, they could close the well. The case is like our coal cases—a matter between the owner and the lessee and not between two lessees or operators.

In New Domain Oil & Gas Co. v. McKinney, 188 Ky. 183, 221 S. W. 245, universally cited, the facts presented were these: An infant deeded her one-seventh undivided interest in a farm to her brother. He later executed an oil and gas lease on the property. After oil was discovered, the infant repudiated her conveyance, which it was held she had the right to do. When the suit was filed claiming that right and asking an accounting, the oil company then had a number of producing wells on the property. The court concluded that, since the plaintiff and her brother were cotenants in the land, the same relation existed between her and the oil company when they acquired the lease. Since a cotenant has the right to occupy and operate the joint property, as in the case of the extraction of minerals, it was thought that an occupying tenant, acting in good faith under the belief that he had exclusive title to the joint property, should be put in the same class as an innocent trespasser. Citing many cases from other courts, it is pointed out that they are not altogether in harmony, although numerically they support the rule that the measure of accounting is to deduct the expenses of taking the mineral and oil from the value at the mouth of the mine or well. Under the influence of our decisions as to coal, and following the Pennsylvania rule applying the royalty basis for past conversion of oil, it was decided that up to the filing of the suit by the infant the oil company was accountable only for the plaintiff's fractional share of the usual royalty. Considering that the filing of the suit brought notice of the situation to the oil company and it could not thereafter claim to be innocent, it was held such method of fixing compensation was not the proper one. We refused, however, to apply the harsh rule as to a willful trespasser to a cotenant where the mineral involved was of such a fugitive nature as to be liable to loss through adjacent operations, and held that, while the cotenant should not be penalized by making it responsible for the gross production, it should account to the other joint owner for her proportion of the net value of the oil produced, which was the market value less cost of extracting and marketing it. So it will be observed that, when knowledge was received that another person had the same status in relation to the ownership of the oil as the one to be charged, it was held that there was an equality of right and that the net proceeds of the jointly owned property, to-wit, the captured oil, should be divided proportionately.

In the light of all these cases, the court is of the opinion that the general rule that the compensation or damages should be the net value of the oil as established by the sale price is the proper one under the circumstances presented in this case, and that such principle of accounting fixed by the judgment is correct.

3. The appellees submit the novel proposition that, if the royalty rule be rejected, they should be permitted to return the same quantity of oil they took from the lease. This is upon the principle that money damage is not recoverable where the property involved may be returned in kind to the legal owner. It is argued that, since oil in the ground is not constant but extremely fluent, it cannot be said that, had the appellants not been interferred with, they would have taken the same oil the appellees took. And, further, that the commingling of that oil with other oil in a pipe line did not constitute a complete conversion of a specific thing. The producer never preserves his particular oil, but is given the right to receive an equal quantity from the stores of the pipe line in which it is placed, and, since the appellees have that quantity of oil and may deliver it to the appellants in the same way, it is maintained, they should be permitted to do so. The court is not impressed with the argument as to such restitution. Can it be said that the oil company would not have received this very oil during the four years when both parties had wells on the lease and the oil company had many others in the neighborhood? Any unauthorized disposition of another's property is actionable conversion, and it seems that was done here.

The very material decrease in the sale value of oil since the peak price which obtained during the period that was taken and sold by the appellees is a matter of common knowledge. The replacement at this late date under the depreciated conditions would work a manifest injustice to the appellants. The court is not inclined to accept this doctrine and to depart from the general criterion which we have already considered and found to be applicable.

4. The sum allowed Hupp and associates as the reasonable cost of producing the oil was $60,148.88, as stated. Objections are raised by the oil company to the inclusion of a number of items of cost. The amount allowed for overhead expenses was $9,380.40, and appellees

say that this entire sum was an improper credit. All the authorities we have noticed sustain the right to credit for such expenses as being a proper and necessary element in the cost of production. Willis' Thornton on Oil and Gas, sec. 59; New Domain Oil & Gas Co. v. McKinney, supra. No authorities to the contrary are cited by the appellants. During this time the appellees had very extensive operations in a number of counties in the Eastern Kentucky oil fields. An auditor kept their accounts in what seems to be an accurate and scientific manner. The overhead expenses were allocated to the several leases in the ratio that the wells on each lease bore to the whole number owned by the appellees. It appears that the seven wells on this lease were assigned their proportionate part. It was agreed during the taking of the testimony that some of the smaller items contained in the account should be eliminated as not being properly chargeable against appellants. The consideration of the criticisms made of the several items entering into this credit does not convince us that they are unfair or improper except two of them.

The income tax paid by appellees was spread over the various leases as an expense of operation. It appears that there was perhaps as much as $1,400 allocated to this lease. Income tax can hardly be regarded as entering into the cost of production. Its very nature repudiates the idea. Moreover, appellees have already filed a claim with the government for a refund of so much of the tax as represented the earnings from this lease, and it would seem under the circumstances that they have a fair chance to recover. It is to be assumed that the appellants will have to render a tax accounting upon the recovery in the case, and they should not be required to pay it twice.

In 1926 the appellees paid their general counsel $6,000 for legal services. Mr. Hupp testified that their business was quite extensive, and that the compensation was treated as are salaries of similar or greater amounts paid annually by other companies to their general counsel. It is admitted that some of the services so paid for were rendered in this litigation, although the attorney counselled the appellees as to all their business and the expense was spread over the various operations. It is obvious that the appellants, who have so vigorously and persistently contended for their rights, are not chargeable with any part of the fees of counsel of their adver-

sary. Whatever legal services were rendered formed no part of the cost of production. Hence so much of this sum as was charged to this operation should be eliminated.

It is stipulated that there was a prudent operation and development of the lease by Hupp. It is admitted in brief that, as to the major items entering into the cost of development, they appear to be just and fair. The allowance of certain other items, to which exceptions are taken on the appeal, seem to have been proper. At any rate, we are not convinced that the chancellor was in error in allowing them.

5. The argument is made that, although appellees asserted their right to take the oil under their top lease, they did not plead justification or mitigation and sought no relief for expenditures made in development. Upon a return, the case was referred to the master commissioner for an accounting or finding of damages without further pleading by either party, but there was a stipulation entered into by the parties which covered all the questions of fact presented by the issues then to be determined. The stipulation supplanted the need of any pleading. Cities Service Oil Co. v. Taylor, 242 Ky. 157, 45 S. W. (2d) 1039, 79 A. L. R. 1374; Lindsey v. Home Ins. Co., 244 Ky. 580, 51 S. W. (2d) 924, 925.

6. The appellants' demand for interest is based upon their claim of a right to recover the gross receipts of the oil, and this, as stated, is under the characterization of the appellees as willful trespassers. The claim was for unliquidated damages. It could not be told what those damages were until there was a judgment. Until a debt is fixed so it can be paid, the obligation to pay interest does not ordinarily arise, but in cases of this character the allowance of interest is discretionary in the court. 17 C. J. 824; Henderson Cotton Mfg. Co. v. Lowell Machine Shops, 86 Ky. 668, 7 S. W. 142, 9 Ky. Law Rep. 831; Schulte v. L. & N. R. R. Co., 128 Ky. 627, 108 S. W. 941, 33 Ky. Law Rep. 31; Magruder v. Ericson, 146 Ky. 89, 141 S. W. 1195. We think the court was correct in not awarding interest.

7. The appellees claim that they should not be held accountable for the sum of $7,118.88 included in the gross receipts of $142,849.28, as this represented a bonus or premium paid them above the regular market price of oil. The reason for this is not disclosed in the record. It is also stipulated that during this time the appellants

570

sold all of the oil which they produced in that territory at the posted market price without such premium, but that they received other financial advantages in the form of loans which were in fact of equal or greater value than such premium. Under those circumstances, it cannot be said that this was an improper charge.

8. The court does not accede to appellees' proposition that, as they developed the property in good faith, they should be granted compensation for such improvements as have enhanced its vendible value. See Bennett Jellico Coal Co. v. East Jellico Coal Co., 152 Ky. 838, 154 S. W. 922; Loeb v. Conley, supra; Rowe v. Arnett, supra. There is no stipulation as to this matter, and the only evidence we have is that of Hupp that in his judgment the added value by reason of the improvements was from $75,000 to $100,000. This without doubt related to the time before the oil was extracted. Under the circumstances, it does not seem to have been error to allow nothing on this account.

9. With the elimination of the two items we have indicated, we feel that the appellants will have been adjudged reasonable, fair, and proper compensation for any and all damages sustained, and the appellees given such consideration as they merited. In a court of conscience, the one party is not chargeable with more and the other is not entitled to less.

And so we come to the end of a long and tortious road and write finis, as we trust, to this historic and vigorous litigation.

The judgment is reversed to the extent indicated and affirmed in all other respects on both the original and cross appeal.

Whole court sitting.

Rees, C. J., and Dietzman and Perry, JJ., dissent from so much of the opinion as holds that no part of the counsel fees should be allowed as a credit